IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WILLIE LOUIS THOMPSON,

        Petitioner,

    v.

ERIC ARNOLD, Warden,[1]

        Respondent.

No. C 12-2850 CW (PR)

ORDER DENYING PETITION
FOR A WRIT OF HABEAS
CORPUS; DENYING
CERTIFICATE OF
APPEALABILITY

Petitioner Willie Louis Thompson, a state prisoner proceeding pro se, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state criminal conviction. For the reasons discussed below, the Court DENIES the petition and a certificate of appealability.

BACKGROUND

I.   Procedural Background

In a joint information filed on February 17, 2006, Petitioner and his codefendant, Lavar Coleman, were charged with the first degree murders of Dante Wallace (count 1) and Ronnell Hodge (count 2). It was additionally alleged that during the murder of Hodge, Petitioner and Coleman personally used and intentionally discharged a firearm causing great bodily injury and death to Hodge; and during the murder of Wallace, Petitioner personally used and intentionally discharged a firearm causing great bodily injury and death to Wallace, and Coleman was "a principal" and armed with a firearm. Petitioner and Coleman were each also

---

[1] In accordance with Habeas Rule 2(a) and Rule 25(d)(1) of the Federal Rules of Civil Procedure, the Clerk of the Court is directed to substitute Warden Eric Arnold as Respondent because he is Petitioner's current custodian.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

charged with possession of a firearm by a felon (counts three and four). A multiple-murder special circumstance pursuant to California Penal Code section 190.2, subdivision (a)(3),[2] was alleged against Petitioner. Finally, it was alleged that Petitioner had two prior serious felony convictions under section 667(e)(2)(A) and section 667(a), and one prior separate prison term under section 667.5(b). 4 Clerk's Transcript (CT) 919-926.

On November 3, 2006, the special circumstance allegation against Coleman was stricken. Augmented CT (November 3, 2006) 32-33.

On November 1, 2007, following a joint jury trial from September through October of 2007, the jury found Petitioner and Coleman guilty on all counts, and affixed the murder as first degree. The jury found the multiple-murder special circumstance to be true. The jury found all of the firearm enhancements true, with the exception that as to count two, it found true only that Petitioner discharged a firearm at Hodge. 5CT 1164-1170, 13 Reporter's Transcript (RT) 2609.

Also, on November 5, 2007, after Petitioner had waived jury trial as to the prior conviction allegations, the sentencing court found the allegations true. 5CT 1175-1176, 14RT 2623.

On January 23, 2008, the court sentenced Petitioner on one count of first-degree murder (Wallace) to life in state prison without the possibility of parole with a mandatory consecutive twenty-five-years-to-life term for the gun use enhancement. The

---

[2] Unless otherwise noted, all further statutory references are to the California Penal Code.

court assessed an additional consecutive twenty-five-years-to-life term with a mandatory twenty-five-years-to life term for the firearm enhancement on the second count of first-degree murder (Hodge).  The court sentenced Petitioner to an additional twenty-five-years-to-life term under the "three strikes" law on count three (possession of a firearm by a felon).  The court assessed five-year terms for each of the two prior serious felony conviction enhancements.  The court "stayed" the one-year term for the prior prison term enhancement.  The total unstayed term was life without possibility of parole, plus 100 years to life, plus ten years in state prison.  14RT 2645, et seq.  On January 24, 2008 and February 8, 2008 respectively, Petitioner and Coleman filed their notices of appeal.  5CT 1183, 3CT 577.

On January 29, 2009, Petitioner filed his opening brief in the California Court of Appeal.  Ex. A.[3]

On September 25, 2009, the State filed its Respondent's Brief.  Ex. B.

On September 29, 2010, the California Court of Appeal filed its opinion affirming the conviction with minor sentencing modifications.  Ex. C, People v. Thompson, 2010 WL 3789138 (Cal. Ct. App.) (unpublished).

On November 1, 2010, Petitioner filed his petition for review in the California Supreme Court.  Ex. D.  According to the state supreme court's online database, the California Supreme Court

_____

[3] In this Order, the Court refers to the arguments made by Petitioner on direct appeal because his federal petition merely lists his claims, which are more clearly explained in his state appellate attorney's opening brief.  See Ex. A at 22-109.

United States District Court
For the Northern District of California

denied review on January 26, 2011.  See People v. Thompson, Case
No. S187673 (Jan. 26, 2011).

On June 4, 2012, Petitioner filed the instant federal habeas
petition.  Doc. no. 1.  On December 3, 2012, the Court directed
Respondent to answer the petition.  Doc. no. 3.  Respondent has
filed an answer; Petitioner has filed a traverse as well as a
memorandum in support of his traverse.  Doc. nos. 7, 12, 14.

II.  Statement of Facts

The California Court of Appeal summarized the facts of this
case as follows:

> In the early morning of April 25, 2004, Wallace and Hodge
> were the victims of a shooting incident on 65th Avenue
> between 14th Street (International Boulevard) and Eastlawn
> Street in an area of Oakland referred to as "The Village."
> At that time the residential area was known for "a lot of
> dope traffic," and gunfire was heard in the area "a lot," at
> least three or four times a week.
>
> Thompson (known as WL), Coleman (known as Moonie), Wallace
> (known as DT), Hodge (known as Nell), and Matthew Cobbs, had
> grown up together and were supposedly friends.  By the time
> of the 2004 shooting, the men were in their late twenties and
> mid-thirties.  Both defendants were still friends with
> Wallace but Coleman was no longer talking to Hodge.  Cobbs
> considered Hodge to be his best friend.  None of the men
> still lived in The Village but Wallace's parents lived in an
> apartment located on Eastlawn Street in The Village.  During
> the six months preceding the shooting incident, Thompson,
> Coleman, and Cobbs continued to hang out in The Village on a
> daily basis, but it had been two or three years since Wallace
> and Hodge had been seen in The Village on a regular basis.
> Wallace and Hodge returned periodically.  Wallace was seen
> mostly on weekends and Hodge was seen "every now and then."
>
> Cobbs was the only witness to the shooting incident who
> testified at the trial.  He arrived in The Village at about
> 1:30 a.m.  He had his .357-caliber revolver concealed in his
> waistband.[FN3]  At the time Cobbs drank liquor on a daily
> basis.  Earlier in the evening he had consumed about two or
> three 40-ounce beers, but he had a high tolerance for alcohol

and his intoxication level was low.  Cobbs saw defendants and other people drinking on 65th Avenue.  According to Cobbs, Thompson was "not very much" intoxicated, and both defendants were "normal," in that apparently they had had a "couple [of] drinks," but were not "too drunk" or "too intoxicated."  Thompson liked to drink probably more than Cobbs, and Coleman drank probably less than Cobbs.

[FN3:] Cobbs explained that he carried a gun in The Village for his own protection (he had been shot in 2003) and because it was necessary to be armed when he sold drugs.  At the time of the shooting, he also owned a .22-caliber rifle and a small assault weapon.  About ten days before the shooting, his girlfriend gave his rifle to Coleman to hold for Cobbs.  He also hid guns around The Village so guns would not be found on his person if he was stopped and searched by the police.  He had also seen both defendants armed in The Village on numerous occasions, and had seen both stash guns around The Village.  He presumed that people who hung out in The Village had guns to protect themselves.

Cobbs asked Coleman for a ride to a liquor store.  During the drive in Coleman's light gray two-door car, Cobbs was in the back seat and Coleman and Thompson were in the front seat.  Cobbs was not sure if Coleman or Thompson drove the car.  The three men bought the largest bottle of gin they could find to share with the people back at The Village.  Cobbs began drinking in the car as they returned to The Village, but he could not recall if defendants had any drinks at that time.  During the ride back to The Village, Cobbs again sat in the back seat and either Coleman or Thompson drove the car.

On the trip to and from the liquor store, Coleman and Thompson started talking mostly about Hodge and Wallace.  Cobbs could not recall Coleman specifically talking about Wallace.  Coleman said Hodge was "not cool," and asked Cobbs why he still "mess[ed] around" with Hodge.  Cobbs replied Hodge was cool to him, and Coleman, in a serious voice, repeated Hodge "just ain't cool."  Thompson then asked, "what's up with DT," referring to Wallace.  Cobbs replied Wallace was cool too, but both Thompson and Coleman responded "they not cool."  Coleman asked Cobbs why he still dealt with Wallace and Hodge.  Coleman also asked Cobbs to call Hodge and ask him to come out that night if he was a "homeboy," but Cobbs refused to call Hodge.  During the conversation, defendants were not joking, and they seemed angry based on the tone of their voices and how they were speaking.

When the men arrived back at 65th Avenue, Cobbs saw Hodge on the sidewalk. Coleman said, "Ooh." Wallace was also on the sidewalk, a few feet away from Hodge, kneeling and talking to someone in a car. The driver of Coleman's car drove past Hodge, made a U-turn, and parked on the same side of the street a few feet behind Hodge. Defendants got out of the car "fast" and headed in separate directions. Coleman went into a nearby parking lot behind his parked car, and Thompson crossed the street and went into some bushes. Cobbs believed defendants were retrieving stashed weapons based on the way they had been talking in the car and their conduct after they left the car.

"Right after" defendants left the car and walked away, Cobbs left the car, and approached Hodge, shaking his hand and hugging Hodge. As he broke off the hug, Cobbs gave his .357-caliber revolver to Hodge. Cobbs attempted to conceal the gun by the way he was standing near Hodge, and how he shook hands and hugged him. Defendants had already "walked off." Hodge put the gun in his waistband. Cobbs said, "What's up? What you doing out here? These niggas tripping." Hodge replied, "I know." Cobbs was trying to convey a warning to Hodge that defendants were "tripping off" that Hodge was out there, and Hodge should leave. Cobbs asked Hodge where his car was so they could leave before things escalated. Cobbs told Hodge he should leave, and the two men started walking towards Hodge's car, which was parked on Eastlawn Street. Cobbs was about two feet behind Hodge, and Wallace was walking about 8 to 10 feet in front of Cobbs and Hodge.

Cobbs saw Thompson walk diagonally from the bushes into the middle of the street in front of him and Hodge; Thompson had his hands in his pockets. Cobbs turned around and saw Coleman a few feet behind him on the sidewalk. Cobbs saw that Coleman had Cobbs's .22-caliber rifle under his arm. As the men walked down the street, Cobbs tried to stay between Coleman and Hodge and between Coleman and Thompson so that nothing would happen to Hodge. Wallace and Thompson were arguing and cussing at each other, loudly, with Thompson doing most of the cussing.[FN4] Coleman did not participate in the argument between Thompson and Wallace. However, on two or three occasions, Coleman pulled and lightly shoved Cobbs's right shoulder backwards, telling Cobbs to get out of the way. Cobbs replied, "No," because he did not want anything to happen to Hodge. Cobbs finally got out of the way when the group reached Eastlawn Street. Although the men were walking "real slow," none of them was having difficulty walking because of potential alcohol impairment.

[FN4:] Cobbs did not see Thompson leave the street and shove or bump into either Wallace or Hodge.  Nor did Cobbs hear either Wallace or Hodge say they did not want any trouble.  However, another witness Khadijah Shahid, who lived on 65th Avenue near East 14th Street, testified that just before the gunfire, she heard loud talking from the sidewalk outside her second-floor living room window.  She saw Thompson walking with two men on the sidewalk underneath her window.  Thompson did not say anything, but he repeatedly bumped his chest into the shoulder of one of the men, then jumped back and put his hands up.  In response to the repeated bumping, one of the men repeatedly said, "Man, we don't want no problems.  We don't want no trouble."  As the men continued walking towards Eastlawn Street, the two men continued to beg to be left alone.  Shahid called 911 and told the operator "someone was fixing to get killed," and then hung up.  Almost immediately thereafter, Shahid heard more than five gunshots that sounded all the same from the direction of Eastlawn.  When the 911 operator called back, Shahid said, "it was too late.  They were dead."  As she was talking to the 911 operator, Shahid saw two men "run out the side parking lot and jump in a white car."  Shahid could not identify the men.

At some point, Hodge was on a little walkway about 20 feet from the sidewalk.  Cobbs stayed on the sidewalk, and Wallace went out into the street within two or three feet of Thompson.  Wallace, a large man, weighing 250 to 300 pounds,[FN5] said something like "Let's get them up, let's fight," and, "I'm done.  Let's just do this."  Wallace did not raise his fists or have any weapons.  Thompson's immediate reaction was to pull a handgun from his pocket and fire five or six shots at Wallace from two to three feet away.  Cobbs saw Wallace's head "ducking forward" while Wallace was "bending at the waist," but Cobbs did not see Wallace actually fall to the street.  As Thompson walked around Wallace in a half circle firing his gun, Cobbs believed the gunfire was now coming in his direction and he crouched behind a car.  Cobbs then heard more gunshots coming from behind him.  Out of his peripheral vision, Cobbs saw Coleman aim his .22-caliber rifle and begin firing in the direction in which Cobbs last saw Hodge in the walkway.  Cobbs heard the rifle expend its entire capacity all in one sequence.  After the rifle started to discharge, Cobbs heard the gunfire of six rounds from his .357-caliber revolver, which he had earlier given to Hodge.  There was a point when both the rifle and the .357 revolver were "going off" at the same time, but the rifle had been shot first.  Cobbs thought the first 10 shots were from Thompson's gun, which sounded like a .9 millimeter pistol.  Cobbs thought the .9 millimeter

United States District Court
For the Northern District of California

pistol (Thompson's gun) was fired at the same time as the .22 caliber rifle (Coleman's gun), right before the .357-caliber revolver (Hodge's gun).  After Thompson stopped shooting at Wallace, Thompson walked to the sidewalk and fired up the walkway in the direction in which Cobbs had last seen Hodge. The .357 caliber revolver was fired before Thompson moved to the sidewalk and started firing in Hodge's direction.  Cobbs heard Thompson fire his gun first, and the last gun he heard was the .357 caliber revolver.  Coleman left one or two seconds before Thompson fired his last shot, and then Thompson took off.  Wallace was then lying in the street. Hodge left a blood trail going from the walkway around the corner to Eastlawn Street in front of Wallace's parents' apartment.

[FN5:] Cobbs estimated Wallace weighed at least 300 pounds at the time of the shooting.  Wallace died about ten days after the shooting.  His autopsy report indicated his height was 6 feet and one and one-half inches, and he then weighed 250 pounds.

Wallace's parents testified regarding their knowledge of the incident.  Inside their second-floor apartment, they heard the gunfire in the street.  Wallace's father recalled he heard at least 15 to 20 gunshots "right after each other"; which lasted one to two minutes.  The gunshots sounded like they came from at least two different guns.  The first gunshots "sounded heavier" or "louder," than the later gunshots, which "weren't completely as loud as the first." He did not recall if he heard more of the louder gunshots later, but he was sure he heard different caliber guns going off at the same time with no significant pauses.  He heard gunshots that might have been fired from a .9-millimeter pistol or revolver, and more gunshots that could have been from a .22-caliber rifle, which came after the other louder noises.  He was sure the quieter gun was the last gun he heard fired, although the guns were fired "right behind each other."[FN6]  Wallace's mother heard "a whole bunch" of "real loud" gunshots, in rapid succession, for fifteen seconds or a minute or two, with no delays or breaks.  About ten or fifteen minutes later, while he was still in his second-story apartment, Wallace's father heard Hodge calling to him from some bushes directly below one of the bedroom windows.  Hodge said, "Help me, . . . .  They got me," and "call my mother." While still in the apartment, Wallace's mother heard Hodge say, "They got me, they got me, Moonie got me," and "call my mom."  When Wallace's father was at Hodge's side, Hodge said, "I'm dying," "They got me," and he had been shot.  Hodge also said he was sorry "for bringing all this stuff round to your

house."   Around the corner from his parents' apartment,
Wallace was found lying on 65th Avenue.  He appeared to have
a gunshot wound to his head and other gunshot wounds to his
upper body.  From an area of around 75 feet where Wallace was
found, the police recovered eight .22-caliber shell casings,
and fifteen .9-millimeter casings.

[FN6:] A police firearms expert testified a gunshot from a
.22-caliber rifle sounds like a "pop,", and not particularly
loud, a gunshot from a .9-millimeter pistol would be loud but
sound like a crack breaking the sound barrier, and a gunshot
from a .357-caliber revolver would be the "heaviest" of the
three gunshots and would sound like a boom instead of a crack
sound.  Cobbs also testified that of the three guns, the
.357-caliber revolver was the "loudest gun."

Hodge died of his wounds that morning.  An autopsy report
indicated Hodge sustained four bullet wounds.  Hodge died due
to a loss of blood from a gunshot wound caused by a .22
caliber bullet found in his abdomen.  Wallace survived the
shooting, sustaining multiple gunshot wounds to the arms,
shoulder, and back, and a graze injury caused by a bullet
plowing through the top left side of his head just above the
ear.  Bullets perforated his right lower lung and hit the
right side of his liver.  No bullets were recovered from
Wallace's body.  Wallace had no wounds from directly in front
of him, but if he were bending over, the shooter could have
been in front of him.  Also, the graze injury on the scalp
could have been caused by the firing of a firearm in front of
Wallace's head and just to his left.  About ten days after
the shooting, while Wallace was in the hospital recovering
from his wounds, he died within minutes when a blood clot
traveled from his leg to his lung.  His cause of death was
determined to be "pulmonary thromboembolism," and
"complicating multiple gunshot wounds of the torso and
extremities."  The autopsy pathologist was of the opinion
that the gunshot wounds set in motion a series of events
resulting in the pulmonary thromboembolism; in other words,
"but for those gunshot wounds, the blood clot would not have
occurred."

On April 27, 2004, the police stopped a vehicle in The
Village.  The front seat passenger discarded a bag as he fled
and avoided capture by the police.  The police identified the
man who fled as someone who hung out in The Village.  Inside
the bag, the police found a .9-millimeter pistol and a .22-
caliber rifle, both with clips.  Cobbs identified the rifle
as his.  The guns matched both the revolver casings and rifle
casings found after the shootings and the rifle bullet found

United States District Court
For the Northern District of California

inside Hodge.  A few weeks after the shooting, Cobbs's .357 caliber revolver containing six expended cartridges was found on the roof of the apartment building where Wallace's parents lived on Eastlawn Street.  Cobbs denied tossing his .357-caliber revolver on the roof.

Defendants presented no witnesses; they offered into evidence several photographic exhibits depicting evidence found at the crime scene, including the bullet casings, a diagram of the crime scene on which a crime scene evidence technician had marked the location of the bullet casings found in the street, and a diagram of the crime scene on which Cobbs had marked the location of both defendants, both victims, and himself at the time "right before the shots go off." Defendants' primary defense was that credible evidence would support findings that defendants' "trash talk" about the victims was not evidence of a conspiracy or intent to kill the victims.  Defendants had armed themselves with guns only after they saw Cobbs hand his .357-caliber revolver to Hodge. Although defendants followed the victims as they walked on 65th Avenue towards Eastlawn Street, where Thompson had a verbal altercation with Wallace, Hodge overreacted to the situation by firing the .357-caliber revolver first. Defendants argued they were therefore entitled to respond in justifiable self-defense.

The jury returned verdicts against both defendants of first degree murder of both victims and possession of a firearm by a felon.  The jury also found that (a) during the murder of Wallace, Thompson personally used and intentionally discharged his firearm, which caused great bodily injury and the death of Wallace, and Coleman was armed with a firearm; and (b) during the murder of Hodge, Coleman personally used and intentionally discharged his firearm, which proximately caused great bodily injury and the death of Hodge, and although Thompson personally used and discharged his firearm, the discharge did not proximately cause great bodily injury or the death of Hodge.  The jury also found Thompson had committed more than one murder within the meaning of section 190.2, subdivision (a)(3) (multiple-murder special circumstance).

Thompson, 2010 WL 3789138, at *2-5 (footnotes in original).

## LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of

United States District Court
For the Northern District of California

the Constitution or laws or treaties of the United States."
28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death
Penalty Act (AEDPA) of 1996, a district court may not grant habeas
relief unless the state court's adjudication of the claim:
"(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in
the State court proceeding."  28 U.S.C. § 2254(d); Williams v.
Taylor, 529 U.S. 362, 412 (2000).

A federal court on habeas review may not issue a writ "simply
because that court concludes in its independent judgment that the
relevant state-court decision applied clearly established federal
law erroneously or incorrectly."  Id. at 411.  Rather, the
application must be "objectively unreasonable" to support granting
the writ.  Id. at 409.  The factual determinations by state courts
are presumed correct unless there is "clear and convincing
evidence to the contrary."  Miller-El v. Cockrell, 537 U.S. 322,
340 (2003).

If constitutional error is found, habeas relief is warranted
only if the error had a "'substantial and injurious effect or
influence in determining the jury's verdict.'"  Penry v. Johnson,
532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S.
619, 638 (1993)).

When there is no reasoned opinion from the highest state
court to consider a petitioner's claims, the court looks to the
last reasoned opinion of the highest court to analyze whether the

state judgment was erroneous under the standard of § 2254(d).

Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).[4]  In the present case, the California Court of Appeal is the highest court that addressed Petitioner's claims in a reasoned opinion.

<div align="center">DISCUSSION</div>

I.   Legal Claims

   A.   Substantial Evidence Challenges

   Petitioner argues that there was insufficient evidence to support the finding that he premeditated the murders of Hodge and Wallace.  Petitioner also argues that insufficient evidence supported the multiple murder special circumstance because there was insufficient evidence to show that he intended to kill Hodge. In addition, the Court will address in this section Petitioner's related claim that the trial court erred by failing to instruct the jury that in order for the multiple murder special circumstance to apply to him, he had actually to kill or intend to kill both victims.

   The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt states a constitutional claim, which, if proven, entitles him to

---

   [4] The one exception here is Petitioner's Wheeler/Batson claims, to which the Court applies de novo review, as discussed below.

<div style="writing-mode: vertical">**United States District Court**
For the Northern District of California</div>

United States District Court
For the Northern District of California

federal habeas relief.  Jackson v. Virginia, 443 U.S. 307, 321, 324 (1979).

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).  Nor does a federal habeas court in general question a jury's credibility determinations, which are entitled to near-total deference. Jackson, 443 U.S. at 326.  If confronted by a record that supports conflicting inferences, a federal habeas court "must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id.  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Payne, 982 F.2d at 338 (quoting Jackson, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. Jackson, 443 U.S. at 324.

The Supreme Court has emphasized that "Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012) (per curiam).  In reviewing habeas petitions, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively

unreasonable.'" Id. (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)). Thus, after AEDPA, a federal habeas court applies the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). To grant relief, a federal habeas court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." Boyer v. Belleque, 659 F.3d 957, 965 (9th Cir. 2011).

Sufficiency of the evidence claims are reviewed with reference to the substantive elements of the criminal offense as defined by the state law. Jackson, 443 U.S. at 324 n.16.

### 1. Evidence of Premeditation and Deliberation (Murder)

#### a. Additional Background Facts

In closing argument, neither defense counsel disputed the identities of the five major players: Petitioner, Coleman, the two victims, and Cobbs. Coleman's counsel admitted that Coleman fired the rifle. 12RT 2510-2511. Similarly, Petitioner's counsel did not ask the jury to find Petitioner was not present; rather he argued that Petitioner fired in self-defense. 12RT 2454, 2474-2476. Petitioner's counsel had to accept that the identification testimony of Shahid was unimpeachable. Similarly, Coleman's counsel recognized the credibility of the dying declaration of Hodge, in which he stated that "Moonie" (Coleman) shot him. 8RT 16. Further, the defense's closing arguments showed that, despite attempts to impeach Cobbs with his lifestyle and his lack of sobriety, his testimony was likely to be believed by the jury.

Cobbs testified that on the day of the incident, he traveled with Petitioner and Coleman to the liquor store and back.  Despite the defense's attempts to pry the testimony apart, Cobbs testified that in the car both Petitioner and Coleman expressed hostility toward both Wallace and Hodge.  Cobbs recalled: Coleman said that Hodge was "not cool"; the tone of the discussion was "serious"; and Petitioner followed up by asking Cobbs what was up with Wallace.  9RT 1889.  The exchange continued:

> Q. And WL [Petitioner] say anything else after you told him that DT [Wallace] was cool, too?
>
> A. They just both said they not cool.
>
> Q. They both said that they not cool.  Who is "they" that said "they not cool?"
>
> A. Moonie [Coleman] and WL.
>
> Q. And you took that as them referring to Ronnell [Hodge] and DT?
>
> A. Yeah.

9RT 1891 (brackets added).

Cobbs's lay opinion on the seriousness of these discussions was substantiated when the car pulled up and Petitioner spotted Hodge on the street.  When Coleman spotted Hodge, Coleman reacted by making the sound "Ooh," "Happy, like. . . ."  9RT 1899-1900.  Cobbs immediately told Hodge that Petitioner and Coleman were "tripping," and handed him Cobbs's .357-caliber revolver.  Next, when Coleman and Petitioner got out of the car, Coleman walked across a parking lot, and Petitioner crossed to some bushes.  Cobbs's belief that Petitioner was retrieving a stashed gun was confirmed when he saw Coleman return carrying the rifle under his arm.  Cobbs, convinced that Petitioner intended to do

United States District Court
For the Northern District of California

1    harm to the victims, told the victims that they had to leave, and

2    started walking them toward their car.

3        As the five men walked down 65th Avenue, Shahid witnessed

4    their interactions.  Shahid testified, just as she had told the

5    911 operator, that someone was "fixing to get killed . . . ."  9RT

6    1770.  Shahid based her belief on several factors.  First, she

7    stated that she knew "somebody was going to get killed, you know.

8    Because I -- Like I said, I haven't been Muslim all my life, and I

9    grew up with folks that . . . did some stuff . . . that it wasn't

10   good."  9RT 1770.  Shahid heard the tones of voices of the victims

11   and Petitioner, and knew that the victims "were begging . . . for

12   their lives.  It was plain.  And this is why I dialed 911 . . . ."

13   9RT 1754.  Shahid identified Petitioner, whom she knew, as the

14   individual who was repeatedly bumping up against Wallace, while

15   Wallace was attempting merely to escape the situation.

16                    b.    State Court Opinion

17       The California Court of Appeal rejected Petitioner's claim of

18   insufficiency of evidence of first degree murder as follows:

19       Thompson challenges the sufficiency of the evidence
         supporting his convictions for first degree murder of Wallace
20       and Hodge.  He specifically argues the evidence was
         insufficient to establish he actually premeditated and
21       deliberately murdered either Wallace or Hodge -- as the
         actual killer, an accomplice, or a conspirator.  He also
22       argues it is an "unfair stretch" to infer that a premeditated
         killing of either victim was a natural and probable result of
23       anything he aided and abetted or conspired to commit with
         Coleman.  Accordingly, Thompson argues the murder convictions
24       against him should be reduced to second-degree murder.  We
         disagree.
25
         In evaluating the sufficiency of evidence, as an appellate
26       court, we "must examine the whole record in the light most
         favorable to the judgment to determine whether it discloses
27       substantial evidence -- evidence that is reasonable, credible
         and of solid value -- such that a reasonable trier of fact
28       could find the defendant guilty beyond a reasonable doubt.

[Citation.]  [We presume] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."  (People v. Kraft (2000) 23 Cal. 4th 978, 1053.)  "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]'  [Citation.]"  (People v. Thomas (1992) 2 Cal. 4th 489, 514.)  "We need not be convinced beyond a reasonable doubt that the murders were premeditated.  Our inquiry on appeal 'in light of the whole record [is] whether any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt.' [Citations.]"  (People v. Sanchez (1995) 12 Cal. 4th 1, 31-32 (Sanchez), disapproved on another ground in People v. Doolin (2009) 45 Cal. 4th 390, 421 & fn. 22 (Doolin).)

Concededly, "'[a] verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill.  [Citation.]  "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.  [Citations.] [However,] "[t]he process of premeditation . . . does not require any extended period of time.  'The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]"' [Citation.]"  (People v. Halvorsen (2007) 42 Cal. 4th 379, 419 (Halvorsen).)  "In People v. Anderson (1968) 70 Cal. 2d 15, 26-27 ([Anderson]), . . ., [our Supreme Court] . . . developed guidelines to aid reviewing courts in assessing the sufficiency of evidence to sustain findings of premeditation and deliberation.  [Citation.]  [The Court] described three categories of evidence recurring in those cases: planning, motive, and manner of killing.  [Citations.]"  (Halvorsen, supra, 42 Cal. 4th at pp. 419-420.)  "[I]t is not necessary that the Anderson 'factors be present in some special combination or that they be accorded a particular weight.' [Citation.]"  (Sanchez, supra, 12 Cal. 4th at pp. 32-33.) "Nonetheless, we are guided by the factors in our determination whether the murder[s] occurred as a result of 'preexisting reflection rather than unconsidered or rash impulse.' [Citation.]"  (Ibid.)

Contrary to Thompson's contentions, the jury could have accepted portions of the testimony of the prosecution's witnesses and the forensic evidence, and reasonably have drawn the inference that, before the shootings both defendants had exhibited a certain animus toward both victims, thereby establishing "the prior relationship from which the jury reasonably could infer a motive for the killings."  (People v. Cruz (1980) 26 Cal. 3d 233, 245 (Cruz).)  Defendants' actions immediately before the killings of securing loaded weapons "can be characterized as 'planning' activity."  (Ibid.; see People v. Wharton (1991)

United States District Court
For the Northern District of California

53 Cal. 3d 522, 547.)  Finally, the number of shots that were apparently fired (police found eight .22-caliber rifle casings and fifteen .9-millimeter pistol casings in the area of the shootings), would permit the jury to find defendants were intent on killing the victims "according to a preconceived design and for a reason."  (Cruz, supra, at p. 245.)  Contrary to Thompson's contention, the jury could have discounted any evidence of his intoxication after reasonably finding "it was not possible to determine the extent of [his] drunkenness at the time of the killings."  (Id. at p. 248.)  Thompson's reliance on the court's instructions regarding accident or excuse is misplaced.  Whether Thompson acted in justifiable self-defense, imperfect self-defense, or accidentally hit Wallace after Hodge shot his gun first, were questions resolved by the jurors, who apparently did not believe Thompson fired his gun in response to Hodge firing his gun first.  Viewing the evidence in the light most favorable to the prosecution, we conclude a rational trier of fact could have been persuaded beyond a reasonable doubt "that the killing[s] [were] the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse. [Citation.]"  (People v. Perez (1992) 2 Cal. 4th 1117, 1125.)

Thompson's argument ignores the applicable law on aiding and abetting.  "A person may aid and abet a criminal offense without having agreed to do so prior to the act. [Citations.]  In fact, it is not necessary that the primary actor expressly communicate his criminal purpose to the defendant since that purpose may be apparent from the circumstances. [Citations.]  Aiding and abetting may be committed 'on the spur of the moment,' that is, as instantaneously as the criminal act itself. [Citation.]  Since . . . any person concerned in the commission of a crime, however slight that concern may be, is liable as a principal in the crime [citations], it follows that an aider and abettor will be responsible for a collateral offense if at any time that he does something that directly or indirectly aids or encourages the primary actor in the commission of a crime, it is reasonably foreseeable that a collateral offense may result."  (People v. Nguyen (1993) 21 Cal. App. 4th 518, 531-532.)  Thus, "[i]n order to hold the accused as an aider and abettor the test is whether the accused in any way, directly or indirectly, aided the perpetrator by acts or encouraged him by words or gestures.  In People v. Luna [(1956)] 140 Cal. App. 2d 662 [(Luna)], the defendant was held to have aided and abetted his codefendant in making an assault on the prosecuting witness where he entered into an altercation which reasonably could lead to trouble, stood by while his codefendant committed the assault, prepared to enter the fight if necessary, and finally entered the fight.  The [appellate] court pointed out that while one who merely stands by watching an assault is not guilty of aiding and abetting, and while the defendant was acquitted of the charge of assault on the person with whom he fought, the evidence sustained his conviction for

United States District Court
For the Northern District of California

aiding and abetting his companion's assault." (People v. Villa (1957) 156 Cal. App. 2d 128, 134-135.)

We similarly find unavailing Coleman's argument that the verdict against him of first-degree murder of Wallace must be reversed -- or reduced to a verdict of second degree murder because there was no evidence from which the jury could reasonably find he foresaw Thompson's deliberate and premeditated shooting of Wallace. Concededly, there was no evidence Coleman attempted to or shot at Wallace. Nevertheless, "whether, as a matter of fact," defendants were joint participants "was for the jury to decide." (Luna, supra, 140 Cal. App. 2d at p. 664.) Contrary to Coleman's contention, the jury could have accepted portions of the testimony of the prosecution's witnesses and the forensic evidence, and drawn the following reasonable inferences: Before the shootings both Thompson and Coleman had exhibited some animus against both Hodge and Wallace. Even assuming Coleman saw Cobbs hand a gun to Hodge, Coleman did not leave the area but prepared for a confrontation by retrieving a loaded firearm. Coleman told Cobbs to stay out of the way, and physically attempted to move Cobbs away, in order to protect Thompson against Wallace if need be. When the opportunity arose, Coleman joined in the altercation by firing his gun at Hodge, who returned gunfire. "In brief, [Coleman] voluntarily entered into an alteration which would probably lead to trouble, stood by prepared to take a hand in the fight and aggressively entered it when he thought the proper time had arrived. The two [defendants] stood together and fought together. There was concert of action and purpose which clearly proved [Coleman] to have been a participant in the entire fight" against both victims. (Id. at p. 665.)

Thompson, 2010 WL 3789138, at *5-7.

      c.   Analysis

Petitioner has failed to demonstrate that the state appellate court's determination was an unreasonable application of Supreme Court authority. The state appellate court correctly noted that there was an abundance of evidence to establish that Petitioner "premeditated and deliberately murdered either Wallace or Hodge -- as the actual killer, an accomplice or a conspirator." Id. at *5. Before the shootings Petitioner and Coleman had exhibited animus against both victims. Petitioner and Coleman secured loaded weapons immediately prior to the killings. Finally, the evidence displayed they were intent on killing the victims based on the

number of shots that were apparently fired.  Looking at all of this evidence, a rational juror could have found that Petitioner's actions were deliberate and premeditated.  It also follows that a rational juror could have chosen not to believe that Petitioner fired his gun in response to Hodge firing his gun first, thus resolving that Petitioner did not act in self-defense.

The state appellate court further found unavailing Petitioner's argument that it was an "unfair stretch" to infer that a premeditated killing of either victim was a natural and probable result of anything he aided and abetted or conspired to commit with Coleman.  As explained by the California Court of Appeal, an aider and abettor will be responsible for the collateral offense (in Petitioner's case, Coleman's killing of Hodge) "if at any time that he does something that directly or indirectly aids or encourages the primary actor in the commission of a crime, it is reasonably foreseeable that a collateral offense may result."  Id. at *7 (quoting Nguyen, 21 Cal. App. 4th at 531-32).  Viewing the evidence in the light most favorable to the prosecution, it is clear that a rational trier of fact could have found that Petitioner foresaw Coleman's deliberate and premeditated shooting of Hodge.  As mentioned above, both Petitioner and Coleman exhibited animus against the victims and armed themselves with loaded weapons.  Cobbs testified that he saw Petitioner shoot Wallace first, and that Cobbs later saw Coleman fire his rifle in the direction in which he last saw Hodge.  Cobbs heard the rifle expend its entire capacity at once.  Cobbs testified that after Petitioner stopped shooting at Wallace, Petitioner fired his gun in Hodge's direction.  Coleman left a few

seconds before Petitioner fired his last shot, and then Petitioner took off soon afterwards.   Because Petitioner directly aided Coleman in the murder of Hodge by shooting in Hodge's direction, a reasonable juror could conclude that it was reasonably foreseeable that Coleman's killing of Hodge would result.   Petitioner and Coleman "stood together and fought together."   Id. at *7 (quoting Luna, 140 Cal. App. 2d at 665).

In sum, viewing the evidence in the light most favorable to the prosecution, Petitioner has failed to show that no rational trier of fact could have found proof that he actually premeditated and deliberately murdered either Wallace or Hodge beyond a reasonable doubt.   Jackson, 443 U.S. at 324.

The California Court of Appeal's rejection of Petitioner's due process claim alleging insufficient evidence supporting his first degree murder convictions was not objectively unreasonable. 28 U.S.C. § 2254(d)(1).   Accordingly, Petitioner is not entitled to habeas relief on this claim.

> 2.   Evidence of Multiple-Murder Special Circumstance
> Allegation and Related Instructional Error

The California Court of Appeal rejected Petitioner's claim of insufficiency of the evidence as to the multiple-murder special circumstance allegation and the related instructional error as follows:

> Thompson argues the jury's true finding that he committed multiple murders should be set aside because "absent clearer evidence" that he killed or intended to kill both victims, he should not be subjected to the multiple murder special circumstance.   We disagree.   Whether the evidence was sufficient to subject Thompson to multiple murder special circumstance was a question to be resolved by the jury. Contrary to Thompson's contentions, the jury could have reasonably found Thompson was the actual killer of Wallace, and Thompson's firing his gun at Hodge, which occurred after

Coleman fired his rifle at Hodge and Hodge returned gunfire, aided and abetted Coleman's killing of Hodge.  Thompson's argument that Cobbs's testimony is "dubious at best" is misplaced.  "Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category.  [Citation.]  To warrant the rejection of the statements given by a witness who has been believed by a [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.  [Citations.]  Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]"  (People v. Huston (1943) 21 Cal. 2d 690, 693, overruled on another ground in People v. Burton (1961) 55 Cal. 2d 328, 352.)  "Because the circumstances reasonably justify the jury's findings, we may not reverse the judgment simply because the circumstances might also reasonably be reconciled with defendant's alternate theories.  [Citations.]"  (People v. Farnam (2002) 28 Cal. 4th 107, 144 (Farnam).)

We also reject Thompson's argument that the court prejudicially erred by failing to instruct the jury that in order for the multiple murder special circumstance to apply to him he had to actually kill or intend to kill both victims.  Without objection or request for modification, the court instructed the jury using language in CALJIC Nos. 8.80.1 and 8.81.3, as follows: "If you find defendant Willie Thompson in this case guilty of murder in the first degree, you must then determine if one or more of the following special circumstances: is or are true or not true: that defendant Thompson has in this proceeding been convicted of more than one offense of murder.  [¶]  The People have the burden of proving the truth of a special circumstance.  If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.  [¶]  If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested or assisted any actor in the commission of the murder in the first degree.  [¶] . . . [¶]  To find that the special circumstance referred to in these instructions as multiple murder convictions is true, it must be proved: [¶] That defendant Thompson has in this case been convicted of at least one crime of murder of the first degree and one or more crimes of murder of the first or second degree."

Thompson argues the instructions were legally incorrect

because the court failed to instruct the jury that in order for the multiple murder special circumstance to apply to him he had to actually kill or intend to kill both victims, and the language in CALJIC 8.80.1 strongly suggested killing or intending to kill one victim was enough.  We see no merit to the arguments.  Consistent with case law interpreting the statutory requirements for a multiple murder special circumstances allegation (see § 190.2; People v. Anderson (1987) 43 Cal. 3d 1104, 1149–1150[FN7]), the jury here was properly instructed that if it was not clear Thompson was the actual killer of "a" human being -- meaning either Wallace or Hodge -- the jury had to find Thompson acted with the intent to kill by assisting any actor in the commission of "the murder in the first degree" of that victim.  There is no "reasonable likelihood" the jury interpreted the instructions as suggested by Thompson.  (People v. Cross (2008) 45 Cal. 4th 58, 67–68 (Cross).)

[FN 7:] Section 190.2, subdivision (a)(3), provides that a defendant who is found guilty of murder in first degree may be imprisoned in the state prison for life without parole if he is found, in the same proceeding, to have been convicted of more than one offense of murder in the first or second degree.  Subdivision (b) of section 190.2 provides that "[u]nless an intent to kill is specifically required under subdivision (a) for a special circumstance enumerated therein, an actual killer, as to whom the special circumstance has been found to be true . . . need not have had any intent to kill at the time of the commission of the offense which is the basis of the special circumstance in order to suffer . . . confinement in the state prison for life without the possibility of parole."  Subdivision (c) of section 190.2 provides that "[e]very person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree," shall be punishable by imprisonment in the state prison for life without the possibility of parole "if one or more of the special circumstances enumerated in subdivision (a) has been found to be true . . . ."  As explained by our Supreme Court in People v. Anderson, supra, 43 Cal. 3d at pp. 1149–1150, "the language of . . . [section] 190.2[, subd.] (b) strongly supports the reading that intent to kill is not required unless the defendant is an aider and abetter rather than the actual killer."  The Court "adopt[ed] the following reading of the relevant statutory provision [ ]: intent to kill is not an element of the multiple-murder special circumstance; but when the defendant is an aider and abetter rather than the actual killer, intent must be proved."

Thompson, 2010 WL 3789138, at *8–9 (footnote in original).

The state appellate court reasonably rejected Petitioner's claim relating to the sufficiency of evidence of the multiple-

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

murder special circumstance allegation.  Viewing the record in the light most favorable to the prosecution, there was ample evidence upon which to make a true finding that Petitioner committed multiple murders.  There was testimonial evidence from Cobbs and Shahid showing that Petitioner murdered Wallace.  There was also evidence that, with intent to kill, Petitioner aided and abetted Coleman's murder of Hodge because Cobbs testified that Petitioner shot in Hodge's direction after Coleman fired his rifle at Hodge.

Furthermore, the state appellate court was objectively reasonable in finding no merit to Petitioner's arguments that: (1) the trial court failed to instruct the jury in order for the multiple murder special circumstance to apply to him he had to actually kill or intend to kill both victims; and (2) CALJIC No. 8.80.1 strongly suggested killing or intending to kill one victim was enough.  First, as part of its evaluation of Petitioner's instructional error claim, the California Court of Appeal implicitly determined that the challenged instructions -- CALJIC Nos. 8.80.1 and 8.81.3 -- were correct as a matter of state law. See id. at *9.  A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Hicks v. Feiock, 485 U.S. 624, 629 (1988).  Therefore, the state appellate court's ruling -- that the challenged instructions were correct as a matter of state law -- is binding on this Court.  See id.  The state appellate court also concluded that there was no "reasonable likelihood" the jury interpreted CALJIC Nos. 8.80.1 and 8.81.3 as suggested by Petitioner.  Thompson, 2010 WL 3789138, at *9.  The

instructions stated that for the jury to find true the multiple-murder circumstance, the jury would have to determine "that [Petitioner] has in this proceeding been convicted of <u>more than one offense of murder</u>."  <u>Id.</u> at *8 (emphasis added).  Moreover, the jury was further instructed that if it was not clear that Petitioner was the actual killer of "a" human being (i.e., either Wallace or Hodge), the jury had to find Petitioner "with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested or assisted any actor in the commission of the murder in the first degree."  <u>Id.</u>

In sum, given the aforementioned evidence, and the doubly deferential standard of review, the state appellate court reasonably rejected Petitioner's claim of insufficiency of evidence of the multiple-murder special circumstance allegation. 28 U.S.C. § 2254(d)(1).  Furthermore, Petitioner's claim of instructional error fails because the state appellate court found that the instructions were wholly sufficient under state law, and that court's ruling is binding on this Court.  The state appellate court further concluded that there was no "reasonable likelihood" the jury interpreted the challenged instructions as suggested by Petitioner.  Accordingly, Petitioner is not entitled to habeas relief on these claims.

B.   Denial of Motion to Sever or Bifurcate

Petitioner alleges the trial court erred in denying his motion to sever or bifurcate the counts in the information accusing Petitioner and Coleman of being felons in possession of a firearm under California Penal Code section 12021.

United States District Court
For the Northern District of California

1.   Additional Background Facts

Petitioner joined Coleman's pre-trial motion to sever counts three and four, the charges against each of them respectively for being a felon in possession of a firearm under California Penal Code section 12021.  2RT 32-33.  Counsel additionally argued that if severance was denied, bifurcation would be appropriate.  2RT 34-35.  The trial court considered the motion and the arguments, and denied both requests, stating as follows:

> It does appear that it's appropriate to have this Count as to each defendant joined with and heard by the jury in the case-in-chief.  The Courts have recognized, and it appears to be the logical recommendation, to not have the particulars of the prior in front of the jury by simply having the defense stipulate to the fact that there was this prior conviction. And pursuant to CALJIC [No.] 12.44, the jury is informed that this element of the prior conviction of a felony has been already established by stipulation, so that no further proof of that fact is required, and that they must accept as true the existence of that prior felony conviction.

> The Courts are very concerned about the particulars of a prior conviction being in front of the jury.  So is this Court.  So this seems to be an appropriate recommendation. The limitation of that information would be only to that Count.  That element has been satisfied, so clearly the severance is not necessary.  And, of course, the bifurcation would be as far as when economics of the trials is considered, that's one of the considerations.

> Ms. Beles [Coleman's attorney] is right, it doesn't require an entirely new jury, but it's consistent with the 954[5] to have this be part of the trial of the case-in-chief of the prosecution, so I'm not going to bifurcate it as well.  As I indicated, there's a ready solution by the stipulation by counsel given what kind of prove-up is necessary.  It doesn't

[5] California Penal Code section 954 is the joinder statute, which reads, in relevant part: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts . . . ; provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses . . . be tried separately . . . ."  Cal. Penal Code § 954.

seem to be an onerous requirement to expect the defense to seriously consider the admission in order to keep that from the jury.

2RT 35-36 (brackets and footnote added).

As to the events that took place after the trial court denied the motion to sever or bifurcate, the Court of Appeal summarized the facts relating to this claim as follows:

. . . After the court denied defendants' motions, both defendants agreed to stipulate they were convicted felons so the jury would hear only the fact of their felon status, but not the nature of the felony convictions.

During voir dire, both the court and defense counsel questioned prospective jurors concerning their ability to consider the fact of defendants' prior felon status only on the firearm possession offenses, and to treat the murder charges separately. The trial court dismissed for cause prospective jurors who indicated that, among other things, they would not be able to consider the charges separately.

As part of the court's closing instructions, the jury was told the elements of the crime of possession of firearm by a felon, and that, "In this case, the previous felony conviction has already been established by stipulation so that no further proof of that fact is required. You must accept as true, the existence of this previous felony conviction." The court also told the jury, "There is a stipulation by the parties that each defendant was previously convicted of a felony. A prior conviction of a felony is an essential element of the crime charged, which the prosecution is otherwise required to prove beyond a reasonable doubt. Do not speculate as to the nature of the prior conviction. That is a matter which is irrelevant and should not enter into your deliberations. You must not be prejudiced against a defendant because of a prior conviction. You must not consider that evidence for any purpose other than for establishing a necessary element of the crime charged." Finally, the jury was told, "A person previously convicted of a felony does not violate [the law] by being in possession of a firearm if: [¶] 1. He as a reasonable person had grounds for believing and did believe that he was or others were in imminent peril of great bodily harm; and [¶] 2. Without preconceived design on his part, a firearm was made available to him; [¶] 3. His possession of such firearm was temporary and for a period of time no longer than that in which the necessity or apparent necessity to use it in self-defense continued; and [¶] 4. The use of the firearm was reasonable under the circumstances and was resorted to only if no alternative means of avoiding the danger was available."

Thompson, 2010 WL 3789138, at *9.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

2.    State Court Opinion

The Court of Appeal denied this claim, as follows:

Defendants argue the trial court abused its discretion in refusing to sever or bifurcate the trial of the firearm possession offenses from the murder offenses because "a substantial danger of prejudice" existed at the time the motion was heard, requiring the firearm possession offenses to be tried separately or tried after the jury considered the murder offenses.  We disagree with defendants' contention.

"When the joinder statute (§ 954) would otherwise permit consolidation of charges, a trial court should, if requested, carefully exercise its discretion whether to try an ex-felon count separately 'in the interests of justice.'  Insofar as the particular facts are known pretrial, the court must balance the legitimate benefits, judicial and prosecutorial, of a consolidated trial against the likelihood that disclosure of ex-felon status in a joint trial will affect the jury's verdict on charges to which that status is irrelevant."  (People v. Valentine (1986) 42 Cal. 3d 170, 179–180, fn. 3 (Valentine).)  Nevertheless, "the burden is on the party seeking severance to establish clearly that a substantial danger of prejudice exists requiring that the charges be tried separately.  [Citation.]"  (People v. Cunningham (2001) 25 Cal. 4th 926, 985 (Cunningham).)  "[R]efusal to sever may be an abuse of discretion where '(1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all; and (4) any one of the charges carries the death penalty.'  [Citation.]"  (Frank v. Superior Court (1989) 48 Cal. 3d 632, 639.)  "The first criterion is most significant because, if evidence on each of the joined charges would have been admissible in a separate trial on the other, '"any inference of prejudice is dispelled."'  [Citations.]"  (Cunningham, supra, 25 Cal. 4th at p. 985.)

We see no abuse of discretion in the court's denial of the motion for a severance.  "Because complete cross-admissibility is not necessary to justify the joinder of counts [citation], in the present case the cross-admissible evidence concerning the [possession of firearms] would justify such joinder.  [Citation.]  The count alleging that defendant[s] possessed a firearm as an ex-felon is not unusually inflammatory or prejudicial.  [Citation.]  Nor did the joinder append a weak case to a strong one, or combine two noncapital cases into a capital case.  [Citations.]"  (Cunningham, supra, 25 Cal. 4th at pp. 985–986.)  "In light of the cross-admissibility of the evidence about whether a gun was used and by whom in the [murder] charge[s], the

personal gun-use enhancement[s] and the charge[s] of ex-felon in possession of a gun, there is no abuse of discretion shown in the trial court's ruling."  (People v. Gomez (1994) 24 Cal. App. 4th 22, 28; see People v. Poggi (1988) 45 Cal.3d 306, 321-322.)

Similarly, we see no abuse of discretion in the court's refusal to bifurcate the trial of the firearm possession offenses from the murder offenses.  As the trial court correctly ruled in this case, it had "only two options when a prior conviction is a substantive element of a current charge: Either the prosecution proves each element of the offense to the jury, or the defendant stipulates to the conviction and the court 'sanitizes' the prior by telling the jury that the defendant has a prior felony conviction, without specifying the nature of the felony committed." (People v. Sapp (2003) 31 Cal. 4th 240, 262.)  These two option were offered to defendants in this case.  Accordingly, there was no error.  (Ibid; see Valentine, supra, 42 Cal. 3d at pp. 179-180, fn. 3.)

Even assuming the court's ruling was correct when made, defendants argue reversal is required because the joint trial of the charges "'actually resulted in "gross unfairness" amounting to a denial of due process [,]' [citation]" and a fair trial.  (People v. Mendoza (2000) 24 Cal. 4th 130, 162.) We conclude the argument fails.  In the absence of a showing it is "reasonably probable" the joinder of the offenses affected the jury's verdict, reversal is not required. (People v. Bean (1988) 46 Cal. 3d 919, 940.)  Assuming the jury accepted the testimony of the prosecution's witnesses, there was strong direct and circumstantial evidence linking defendants to the murders of Wallace and Hodge.  We further conclude, for the same reasons discussed in section V., infra, that the prosecutor's closing remarks, when read in context, did not so exploit the admission into evidence of defendants' felon status as to require reversal.  Finally, a strong indication the jury was not influenced by any possible spillover affect [sic] of joinder is that during deliberations the jury asked for copies of certain exhibits relating to both murders, and the jury acquitted Thompson of causing Hodge's death, thereby demonstrating the jury apparently viewed and evaluated the evidence on each count and sentence enhancement separately as required by the jury instructions.  (See People v. Koontz (2002) 27 Cal. 4th 1041, 1075.)

Id. at *10-11 (footnote omitted).

### 3.   Applicable Federal Law

A joinder, or denial of severance, of co-defendants or counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process.  Grisby v.

29

Blodgett, 130 F.3d 365, 370 (9th Cir. 1997).  A federal court

reviewing a state conviction under 28 U.S.C. § 2254 does not

concern itself with state law governing severance or joinder in

state trials.  Id.  Its inquiry is limited to the petitioner's

right to a fair trial under the United States Constitution.  Id.

To prevail, therefore, the petitioner must demonstrate that the

state court's joinder or denial of his severance motion resulted

in prejudice great enough to render his trial fundamentally

unfair.  Id.  In addition, the impermissible joinder must have had

a substantial and injurious effect or influence in determining the

jury's verdict.  Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir.

2000).

There is a "high risk of undue prejudice whenever . . .

joinder of counts allows evidence of other crimes to be introduced

in a trial of charges with respect to which the evidence would

otherwise be inadmissible."  United States v. Lewis, 787 F.2d

1318, 1322 (9th Cir. 1986).  This risk is especially great when

the prosecutor encourages the jury to consider the two sets of

charges in concert, e.g., as reflecting a modus operandi even

though the evidence is not cross admissible, and when the evidence

of one crime is substantially weaker than the evidence of the

other crime.  Bean v. Calderon, 163 F.3d 1073, 1084-85 (9th Cir.

1998).  But joinder generally does not result in prejudice if the

evidence of each crime is simple and distinct (even if the

evidence is not cross admissible), and the jury is properly

instructed so that it may compartmentalize the evidence.  Id. at

1085-86; see, e.g., Davis v. Woodford, 384 F.3d 628, 638-39 (9th

Cir. 2004) (denial of motion to sever trial of capital and

noncapital charges based on separate incidents not a violation of due process because evidence was cross-admissible, the weight of evidence with respect to each incident was roughly equal, the evidence as to each incident was distinct, and the jury was properly instructed).  Similarly, joinder generally does not result in prejudice if the jury did not convict on all counts because it presumably was able to compartmentalize the evidence. Park v. California, 202 F.3d 1146, 1149-50 (9th Cir. 2000).

### 4.   Analysis

The state appellate court's denial of this claim was not objectively unreasonable.  First, as noted by the state appellate court, there was no abuse of discretion in the trial court's denial of the motion for a severance because: (1) the cross-admissible evidence concerning the possession of firearms would justify such joinder; (2) the count alleging that Petitioner possessed a firearm as an ex-felon "is not unusually inflammatory or prejudicial"; and (3) the joinder neither appended a weak case to a strong one, nor combined two noncapital cases into a capital case.  Thompson, 2010 WL 3789138, at *10.  Second, the state appellate court was also reasonable in finding no abuse of discretion in the trial court's refusal to bifurcate the trial of the firearm possession offenses from the murder offenses.  It determined that the trial court did not err in presenting two options to Petitioner when a prior conviction is a substantive element of a current charge:  (1) "the prosecution proves each element of the offense to the jury"; or (2) "the defendant stipulates to the conviction and the court 'sanitizes' the prior by telling the jury that the defendant has a prior felony

conviction, without specifying the nature of the felony committed." Id. (citing Sapp, 31 Cal. 4th at 262.)

Petitioner has not shown that the state court's denial of his motion to sever or bifurcate resulted in prejudice great enough to render his trial fundamentally unfair or that the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict. See Grisby, 130 F.3d at 370. The evidence was brief, strictly limited, relatively mild, and easy to compartmentalize.

Finally, Petitioner argues that the prejudicial effect of the admission of the prior was exacerbated by the prosecutor's misuse of that evidence. The record shows that the prosecutor argued that the jury had heard Cobbs say that he, and both defendants, had routinely stashed guns in "The Village." 12RT 2414. The prosecutor added: "They were both convicted felons, so presumably they didn't want to get pulled over in a car with guns." 12RT 2414. The prosecutor's aforementioned argument violated the trial court's instruction, above, limiting the prior conviction evidence to the California Penal Code section 12021 charge. However, the state appellate court noted that there were no objections in the record to the prosecutor's statement; therefore, the issue was procedurally defaulted and the challenge was forfeited for review. Thompson, 2010 WL 3789138, at *17 (citing People v. Stanley, 39 Cal. 4th 913, 936 (2006). In any event, the state court found no prosecutorial misconduct, which finding was objectively reasonable, as discussed below in the section relating to Petitioner's claims of prosecutorial misconduct. See infra Discussion I.D.3.

Accordingly, the state appellate court's adjudication of Petitioner's claim relating to the denial of his motion to sever or bifurcate did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.  Accordingly, Petitioner is not entitled to relief on this claim.

C.   Batson Claim

Petitioner (an African-American) claims that the trial court violated his rights to Equal Protection by allowing the prosecutor to exclude six prospective jurors, who described themselves as Black and/or African-American.

1.   Background Facts

The parties do not dispute the California Court of Appeal's description of the relevant trial court proceedings, as follows:

> Defendants made a joint motion challenging the prosecutor's use of peremptory challenges against prospective Black and/or African-American jurors pursuant to People v. Wheeler (1978) 22 Cal. 3d 258 (Wheeler) and Batson v. Kentucky (1986) 476 U.S. 79 (Batson).  At that point in the voir dire, the prosecutor had used 14 of 30 peremptory challenges, and he had excused six jurors who self-described themselves as Black and/or African-American.  There was one self-described Black prospective juror who had been passed by all parties and was ultimately empanelled on the jury, and there were "a fair number of [B]lack jurors that remain[ed] in this jury panel" to be questioned by the court and counsel.[FN9]
>
> [FN9:] Ultimately the jury included two self-described Black and/or African-American jurors.
>
> Outside the presence of the venire panel the court heard argument on defendants' motion.  Over the prosecution's objection, the court found defendants had demonstrated a prima facie showing giving rise to an inference of discriminatory use of peremptory challenges by the prosecutor regarding the six excused jurors who self-described themselves as Black and/or African American.[FN10]
>
> [FN10:] Because the Attorney General does not challenge the court's finding of a prima facie showing of discriminatory intent, we do not address the matter on this appeal.  We

United States District Court
For the Northern District of California

express no opinion on whether defendants met their initial burden of demonstrating a prima facie case of group bias on the part of the prosecutor.

The prosecutor explained his reasons for striking the six prospective jurors, as follows: "Juror Number 61 indicated that she was unable to follow the rule that the testimony of a single witness, if believed, is sufficient to prove any fact.  In her questionnaire, she indicated that she could not follow that rule; that she would need more proof and more witnesses.  She was given an opportunity, after hearing the Court expand upon that rule, to come down from that position, and, frankly, she did not.  She maintained during oral voir dire that she could not accept the testimony of a single witness as sufficient to prove a fact.  And on that basis, I exercised a peremptory challenge of her.[FN11]  [¶]  Juror Number 15 indicated to me in response to a question in oral voir dire as to whether or not she could disregard consideration of penalty or punishment if selected to serve, and she said, quite ambiguously, no.  And that in light of what I thought was a bizarre explanation of her understanding of what it meant to be a thug, that thugs were either demons or angels.  And her description of a fictional character from the Harry Potter series as a person who she greatly admires caused me great concern that she might be someone, according to her word, who would be plagued by notions of punishment and, accordingly, unable to give the prosecution a fair trial in this case.  [¶]  Juror Number 29, I think it was clear, and in particular from oral voir dire, he had . . . negative views toward police officers, in part based on his personal experience, and more specifically, a negative view towards Oakland [p]olice officers, based on the illustration he gave of his interaction with the police when he reported . . . [being] . . . robbed by the Lake.  But it was clear that in general, he had a very negative view of the Oakland Police Department.  He, also, called into question the motive of the District Attorney's Office in filing [section] 12021 Counts in this case against each Defendant, and seemed to suggest it was the product of some trickery or some gamesmanship, and, accordingly, he could not give the People in this case a fair trial.  [¶]  Juror Number 25 sat a few days because I wasn't quite certain what I was going to do with her, but what troubled me were three things: First, in her questionnaire, she indicated she had been fired by Home Depot.  And the Court asked her to explain why she was fired.  And she indicated that she was fired over something to do with money.  And I wasn't satisfied with her explanation when she tried to, I think, show that it wasn't related to some concern that she had stolen.  I found her response, frankly, to be confusing, and I'm concerned anytime that somebody has been terminated from a job.  That, in and of itself, is not necessarily a problem, but someone who has been terminated based on mishandling of money is suggestive of someone who may be less than completely honest and somebody I don't feel would be a fair and impartial juror to the prosecution in this case.  [¶]  I, also, am concerned that she had applied

34

for work with the Sheriff's Department in Alameda County and, apparently, been rejected.  In my experience, people who have sought employment in law enforcement only to be rejected oftentimes develop an anti-law enforcement bias which derives from that rejection.  [¶]  I, also, as a third point on her, it's one thing to seek a job in corrections because it's a government job and pays good benefits and pays good wages and has a good retirement.  I think it's a little unusual when someone is drawn to the profession of working with prisoners to the extent they make it their college major, and she has a degree, I believe, from a university, I believe in Oklahoma, in corrections.  And to me, that demonstrates a fascination with criminals that I find to be troubling, and accordingly, I did not feel she would be a fair and impartial juror for the prosecution in this case.  [¶]  As to Juror Number 78, two concerns that I have with her.  In her questionnaire, she said she could not pass judgment; that that was only something that God was empowered to do.  And although she attempted to distinguish, after some questioning by the Court and myself, between the notion of finding someone guilty or not guilty and notions of passing judgment, I did not find her answers to be satisfactory, which is why in questioning her, I incorporated the Court's colloquy with [another prospective juror] . . . [who] had been excused previously from that seat.  She did not satisfy me, in other words, in her responses that she truly understood the distinction, or that it was a distinction that would have any meaning for her.  [¶]  More importantly, I'm always troubled when someone has been prosecuted by the Office that I represent, and in this case, Juror Number 78 was prosecuted for welfare fraud by the Alameda County District Attorney's Office and sustained a conviction as result of that prosecution.  And, in my experience, people who have been prosecuted by my Office tend to have a negative view of my Office, and accordingly, I did not believe she would be a fair and impartial juror in this case.  [¶]  Finally, Juror Number 4 had serious issues with police officers that derived from a few things; one being her relationship, apparently, with an Oakland [p]olice officer who, during the course of that relationship, albeit in the past, would tell her about all of the various and sundry improper and illegal things that he did.  It would be my concern that she would impute that kind of behavior, if she believed him, to the department as a whole and would, accordingly, not give a fair hearing to the testimony of the Oakland Police Department.  [¶]  Further, she made mention on a number of occasions of the Riders case and the opinions she's formed about the Oakland Police Department as a result of the Riders prosecution . . . .  I find that when people fill out the questionnaire, they have a tendency to be a bit more honest about their true feelings than they do when they're responding to oral voir dire in open court in front of a large number of strangers.  And so her attitude, clear attitude, toward police officers, which I would describe as a bias against police officers, suggested to me she would not be a fair and impartial juror for the prosecution in this case."  After the trial court mentioned

United States District Court
For the Northern District of California

certain comments made by Juror Number 4, the prosecutor also added that those comments describing the juror's description of the arrest of her son at Juvenile Hall and "her belief that it was somehow improper to arrest him at his job site as simply another element tending to indicate a general bias against police officers."  Because the prosecutor did not take notes of everything said by every prospective juror, the prosecutor incorporated into his argument the questionnaires and portions of the transcript concerning the oral voir dire of each of the challenged jurors.

[FN11:] Coleman's appellate counsel could find nothing in the reporter's transcript of the voir dire supporting the prosecutor's rationale for dismissing Juror Number 61. Thompson's appellate counsel makes a similar comment. However, it appears that appellate counsel could not locate Juror Number 61's contrary responses because the court reporter apparently referred to Juror Number 61 as Juror Number 31 at transcript pages 444–448.  Based on the juror's responses to questions asked by the court and the prosecutor at those pages of the reporter's transcript, and a review of Juror Number 61's written questionnaire, we are reasonably certain that both the prosecutor and the court questioned Juror Number 61 about her ability to follow the single witness rule after she had initially indicated she could follow the rule.

Coleman's counsel did not take issue with incorporating the record of both the oral voir dire and the questionnaires. Nor did counsel raise any challenge to the prosecutor's reasons for excusing the jurors, but noted only she was unclear as to how long Juror Number 25 had been sitting before her removal.  Thompson's counsel had "next to nothing to say," other than he did not think the credibility of police officers would ultimately play any part in the trial because the police officers' testimony would be "rather noncontroversial."

The court denied defendants' Wheeler/Batson motion after finding the prosecutor's explanations for striking the challenged jurors were factually based, legally appropriate, and were the actual basis for the challenges.  In so ruling, the court explained: "As to Juror 61, I did have the same concerns with her with regards to following the testimony of a single witness rule, and her explanations weren't necessarily satisfactory.  And I can see how [the prosecutor] had an issue with that juror, particularly given the fact that, apparently, this case is going to rest greatly on the testimony of a single witness . . . .  [¶]  As to Juror 15, she was a very different sort of personality, and I was trying to understand why, in my mind, even though [the prosecutor] didn't indicate it, some of her responses were either preceded by, or included, or followed with kind of an inappropriate almost laughter, or an attitude that seemed to indicate she was somehow minimizing what was going on. And that's what made it more difficult, for instance, to

understand, and was consistent with some of her explanations about thugs, for instance, being demons or angels.  It was difficult to understand her state of mind.  [¶]  And, also, consistent with the Albus Dumbledore reference of one or two people she respects or admires the most, and that, therefore, made it more difficult to, also, understand how she viewed penalty and punishment, and whether or not she could truly disregard that rule that the jury may not consider . . . .  [¶]  Juror 29 was a very strong-willed individual as a labor rep, and I believed that . . . although he was clearly unhappy about what happened to him with regards to being robbed at gunpoint at the Lake, and not necessarily what happened that the Oakland Police Department, how they handled the case, the real concern that surfaced later was his belief that the DA had inappropriately charged Counts Three and Four.  I spent a long time talking about it, in part because I misunderstood one of the key words . . . .  But he was clearly questioning the motives of the District Attorney's Office in filing the charge, and he was very strong about . . . how he was questioning these motives.  And as a result, I understand how [the prosecutor] had some concerns about the state of mind of Juror . . . 29 questioning the DA's motives . . . .  [¶]  As to Juror 25, . . . I did have some serious concerns about her honesty . . . as a result of what she was willing to admit about why she was fired by Home Depot at two levels: One, it showed there was a clear moral turpitude issue of theft from Home Depot; and secondly, it appeared she wasn't being forthcoming about what the real issue was.  But . . . she wasn't really honest and open about what happened, and that gave me concerns as well on two levels.  So I can agree with [the prosecutor] as to the fact that she wouldn't be a fair and impartial juror for those reasons . . . .[FN12]  [¶]  Juror 78, . . . [T]he two concerns that [the prosecutor] indicated that she did state, that she couldn't pass judgment, and . . . she indicated from her questionnaire, her answer to the question is, do you hold religious beliefs that might affect your ability or willingness to serve in a criminal case, she marked the box yes, and explained by saying, 'Choose not to pass judgment on any individual.  That is God's duty.'  And that despite her explanation, it was not necessarily a religious belief[, i]t may have been based in part on a religious belief, but she, actually did not want to.  It was her choice rather than a feeling there was a religious compulsion not to, even though that may have been the original foundation.  [¶]  And clearly, the fact that she had been prosecuted by the Alameda County DA's Office for welfare fraud . . . .  [¶]  Juror Number 4[,] . . . the real concern that I had, that I agree with [the prosecutor], is the way she views Oakland Police Department and officers in general.  And, of course, as I indicate, our criminal justice system is designed to have police officers work with the DA's office, and I described how they investigate [and] submit a police report to the DA's Office.  Of course, they become witnesses for the DA in attempting to prosecute the case.  [¶]  And her incredibly negative opinion of this individual who worked as a police

officer, even after she described he committed criminal
conduct against her, but, also, how he had described not only
his behavior on the job while on the street, but also, that
of other Oakland [p]olice officers that he worked with and
witnessed, and that seemed to be consistent with what she
indicated was brainwashing, even though she did correct
it . . . , but she had very, very strong feelings about the
Oakland Police Department that were completely negative.  [¶]
And she did indicate an inappropriate arrest of her son at
the job site, which was, of course, connected to law
enforcement and the DA's Office filing charges. . . ."

[FN12:] The trial court did not necessarily accept the
prosecutor's additional reasons for striking Juror Number 25,
namely, that the juror's college degree in corrections showed
a "troubling" fascination with criminals, and the rejection
of her application to work with the Alameda County Sheriff's
Department showed she might have an anti-law bias.  Because
the trial court did not base its ruling on those reasons
given by the prosecutor, "we need not discuss whether th[ose]
reason[s] for [excusal] [were] genuine."  (<u>People v. Avila</u>
(2006) 38 Cal. 4th 491, 545, fn. 36 (<u>Avila</u>).)

<u>Thompson</u>, 2010 WL 3789138, at *11-13 (footnotes in original).

     2.    State Court Opinion

The California Court of Appeal set forth the relevant law and

denied this claim, finding that the trial court did not err when

it determined that Petitioner failed to prove purposeful

discrimination in his <u>Batson/Wheeler</u> motion:

"Both the state and federal Constitutions prohibit the use of
peremptory challenges to exclude prospective jurors based on
race . . . .  [Citations.]  Such a use of peremptories by the
prosecution 'violates the right of a criminal defendant to
trial by a jury drawn from a representative cross-section of
the community under article I, section 16 of the California
Constitution.  [Citations.]  Such a practice also violates
the defendant's right to equal protection under the
Fourteenth Amendment to the United States Constitution.'
[Citation.]"  (<u>People v. Bonilla</u> (2007) 41 Cal. 4th 313, 341
(<u>Bonilla</u>).)

The procedure to evaluate claims of discriminatory use of
peremptory challenges is the same under both the state and
federal Constitutions.  (<u>Bonilla</u>, <u>supra</u>, 41 Cal. 4th at p.
341.)  "There is a rebuttable presumption that a peremptory
challenge is being exercised properly, and the burden is on
the opposing party to demonstrate impermissible
discrimination.  [Citations.]"  (<u>Ibid.</u>)  When a defendant
objects to a prosecutor's use of a peremptory challenge, the
procedure "is settled:  'First, the defendant must make out a

prima facie case by "showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.]  Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.]  Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the [peremptory challenge] has proved purposeful racial discrimination." [Citation.]' [Citations.]" (People v. Lancaster (2007) 41 Cal. 4th 50, 74 (Lancaster), quoting Johnson v. California (2005) 545 U.S. 162, 168.)  At issue on this appeal is the third step of the analysis.

We initially see no relevance to defendants' comments that some of the prosecutor's reasons for excusing jurors are "far fetched to say the least," an "overstatement," "simply puzzling," "unpersuasive," or "dubious."  At the third stage of the analysis, "'[t]he proper focus . . . is on the subjective genuineness of the race-neutral reasons given for the peremptory challenge, not on the objective reasonableness of those reasons.' [Citation.]" (People v. Adanandus (2007) 157 Cal. App. 4th 496, 506 (Adanandus).)  "''The party seeking to justify a suspect excusal need only offer a genuine, reasonably specific, race- or group-neutral explanation related to the particular case being tried. [Citations.] The justification need not support a challenge for cause, and even a "trivial" reason, if genuine and neutral, will suffice. [Citations.]'" (People v. Ervin (2000) 22 Cal. 4th 48, 74-75.)  "'A reason that makes no sense is nonetheless "sincere and legitimate" as long as it does not deny equal protection. [Citation.]' [Citation.]" (People v. Stanley (2006) 39 Cal. 4th 913, 936 (Stanley).)

We also reject defendants' related contentions that the court failed to make adequate findings regarding the true factors motivating the prosecutor's challenges, a remand for adequate findings is required, and de novo review is appropriate because the trial court did not conduct a complete and thorough analysis.  Following the procedure outlined by our Supreme Court in People v. Lenix (2008) 44 Cal. 4th 602 (Lenix), the trial court here "considered the prosecutor's reasons for the peremptory challenges at issue and found them to be race-neutral; . . . those reasons were consistent with the court's observations of what occurred, in terms of the panelist's statements as well as any pertinent nonverbal behavior; and . . . the court made a credibility finding that the prosecutor was truthful in giving race-neutral reasons for the peremptory challenges." (Id. at p. 625; see People v. Ledesma (2006) 39 Cal. 4th 641, 680, fn. 7 (Ledesma).) Consequently, "[w]e review the trial court's ruling on the question of purposeful racial discrimination for substantial evidence. [Citation.]" (Avila, supra, 38 Cal. 4th at p. 541.)  "As a reviewing court, we presume the [prosecutor] use[d] peremptory challenges in a constitutional manner, and defer to the trial court's ability 'to distinguish bona fide

reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.' [Citation.]" (Lenix, supra, 44 Cal. 4th at p. 626.) "So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." (People v. Burgener (2003) 29 Cal. 4th 833, 864.) As we now discuss, defendants' contentions that there is insufficient evidence to support the trial court's ruling are unavailing.

Specifically, we see no merit to defendants' arguments that the prosecutor's exclusion of jurors who had negative experiences with the criminal justice system was evidence of discrimination because police misconduct was not at issue and the testimony of the police officers was relatively unimportant. (See Lancaster, supra, 41 Cal. 4th at p. 77 ["no inference of discrimination arises from the removal of a prospective juror whose brother had a recent negative experience with the criminal justice system"]; Farnam, supra, 28 Cal. 4th at p. 138 ["close relative's adversary contact with the criminal justice system" is one ground on which the prosecutor might reasonably have challenged prospective juror]; People v. Turner (1994) 8 Cal. 4th 137, 171 (Turner) [courts have "repeatedly upheld peremptory challenges made on the basis of a prospective juror's negative experience with law enforcement"], overruled on other grounds in People v. Griffin (2004) 33 Cal. 4th 536, 555, fn. 5; Wheeler, supra, 22 Cal. 3d at p. 277, fn. 18 [prospective juror's disclosure of his own conviction or relative's conviction of a crime and current incarceration "has often been deemed to give rise to a significant potential for bias against the prosecution"]).

Nor are we persuaded by defendants' contentions that some of the challenged jurors indicated by their responses they would be appropriate pro-prosecution jurors. A prospective juror's expression of an ability to put aside personal opinions and follow the law does "not signify ... the prosecutor was bound to accept [the juror] if reasons apart from group bias supported his challenge . . . ." (People v. Cornwell (2005) 37 Cal. 4th 50, 72, disapproved on another ground in Doolin, supra, 45 Cal. 4th at p. 421 & fn. 22; see People v. Watson (2008) 43 Cal. 4th 652, 679-680; Avila, supra, 38 Cal. 4th at pp. 554-555.)

Also unavailing is defendants' challenge to the court's ruling based on a comparative analysis of the excused jurors and jurors that were ultimately empanelled. Although "evidence of comparative juror analysis must be considered . . . even for the first time on appeal if relied upon by defendant and the record is adequate to permit the urged comparisons," such an analysis "on a cold appellate record has inherent limitations." (Lenix, supra, 44 Cal. 4th at p. 622.) "When a comparative juror analysis is undertaken for the first time on appeal, the prosecutor is never given the opportunity to explain the differences he perceived in jurors who seemingly gave similar answers. [¶] Moreover,

the selection of a jury is a fluid process, with challenges for cause and peremptory strikes continually changing the composition of the jury before it is finally empanelled . . . . 'The particular combination or mix of jurors which a lawyer seeks may, and often does, change as certain jurors are removed or seated in the jury box.  It may be acceptable, for example, to have one juror with a particular point of view but unacceptable to have more than one with that view.  If the panel as seated appears to contain a sufficient number of jurors who appear strong-willed and favorable to a lawyer's position, the lawyer might be satisfied with a jury that includes one or more passive or timid appearing jurors.  However, if one or more of the supposed favorable or strong jurors is excused either for cause or [by] peremptory challenge and the replacement jurors appear to be passive or timid types, it would not be unusual or unreasonable for the lawyer to peremptorily challenge one of these apparently less favorable jurors even though other similar types remain.  These same considerations apply when considering the age, education, training, employment, prior jury service, and experience of the prospective jurors.' [Citation.] [¶] . . . Two panelists might give a similar answer on a given point.  Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable.  These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding." (Id. at pp. 623-624.)  Because the issue is raised for the first time on appeal in this case, our review is necessarily circumscribed.  We review the trial court's finding "on the record as it stands at the time the Wheeler/Batson ruling is made." (Id. at p. 624.)  We see no reason to question the trial court's findings in this case as the "examples of 'comparative' jurors cited by defendant[s] are not truly comparable to those whom the prosecutor excused." (Ledesma, supra, 39 Cal. 4th at p. 679; see also Avila, supra, 38 Cal. 4th at p. 547 [a single similarity between jurors does not mean the jurors are similarly situated for purposes of comparative analysis]; Turner, supra, 8 Cal. 4th at pp. 169-170 [court rejected defendants' argument that prosecutor's justifications for excusing prospective jurors should be rejected to the extent other non-Black jurors apparently exhibiting the same limitations were not excused].)

Id. at *14-16.

   3. Applicable Federal Law

The use of peremptory challenges by either the prosecution or defense to exclude cognizable groups from a jury may violate the Equal Protection Clause.  See Georgia v. McCollum, 505 U.S. 42,

55-56 (1992).  The Supreme Court has held that the Equal
Protection Clause forbids the challenging of potential jurors
solely on account of their race.  See Batson v. Kentucky, 476 U.S.
79, 89 (1986).[6]  Batson permits prompt rulings on objections to
peremptory challenges under a three-step process:

First, the defendant must make out a prima facie case that
the prosecutor exercised peremptory challenges on the basis of
race "by showing that the totality of the relevant facts gives
rise to an inference of discriminatory purpose."  Batson, 476 U.S.
at 93-94.

Second, if the requisite showing has been made, the burden
shifts to the prosecutor to articulate a race-neutral explanation
for striking the jurors in question.  Id. at 97; Wade v. Terhune,
202 F.3d 1190, 1195 (9th Cir. 2000).

Finally, the trial court must determine whether the defendant
has carried his burden of proving purposeful discrimination.
Batson, 476 U.S. at 98; Wade, 202 F.3d at 1195.  To fulfill its
duty, "the trial court must evaluate the prosecutor's proffered
reasons and credibility under 'the totality of the relevant
facts,' using all the available tools including its own
observations and the assistance of counsel."  Mitleider v. Hall,
391 F.3d 1039, 1047 (9th Cir. 2004); Lewis v. Lewis, 321 F.3d 824,
831 (9th Cir. 2003).  "As part of its evaluation of the
prosecutor's reasoning, the court must conduct a comparative juror
analysis . . . ," particularly when the state court declined to do

---

[6] The California counterpart to Batson is People v. Wheeler,
22 Cal. 3d 258 (1978).

United States District Court
For the Northern District of California

so.  Jamerson v. Runnels, 713 F.3d 1218, 1224 (9th Cir. 2013).
Specifically, where the state court has failed in its duty to
conduct a comparative juror analysis, such an analysis should be
undertaken de novo, rather than by remanding the case to the state
courts to do so.  Green v. Lamarque, 532 F.3d 1028, 1031 (9th Cir.
2008) (citing Miller-El v. Dretke, 545 U.S. 231, 241 (2005)).
Once the federal court has undertaken the comparative juror
analysis, then the court must reevaluate the state decision in
light of such analysis and any other evidence pointing toward
purposeful discrimination in order to determine whether the state
was unreasonable in finding the prosecutor's race-neutral
explanations to be genuine.  Castellanos v. Small, 766 F.3d 1137,
1148-51 (9th Cir. 2014).

In evaluating the race-neutrality explanation, the court must
keep in mind that proof of discriminatory intent or purpose is
required to show a violation of the Equal Protection Clause.  See
Hernandez v. New York, 500 U.S. 352, 355-62 (1991) (no
discriminatory intent where Latino jurors dismissed because of
possible difficulty in accepting translator's rendition of Spanish
language testimony).  It should also keep in mind that a finding
of discriminatory intent turns largely on the trial court's
evaluation of the prosecutor's credibility.  See Rice v. Collins,
546 U.S. 333, 340-41 (2006); Lewis, 321 F.3d at 830.  Because
determinations of credibility and demeanor of the prosecutor and
jurors lie "'peculiarly within [the] trial judge's province,'" the
trial court's ruling on the issue of discriminatory intent is
entitled to great deference and must be sustained unless clearly
erroneous.  Snyder v. Louisiana, 552 U.S. 472, 476-82 (2008)

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

(quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985)); see Felkner v. Jackson, 562 U.S. 594, 596-98 (2011) (per curiam) (reversing Ninth Circuit's "inexplicable" and "unexplained" finding that proffered race-neutral explanations for peremptory strikes were insufficient to outweigh evidence of purposeful discrimination).

A federal habeas court need not dwell on the first step of the Batson analysis if the matter has proceeded to the second or third step. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." Hernandez, 500 U.S. at 359. Once a district court has found intentional discrimination (the third Batson step), it cannot "reevaluate" that finding based simply on a reassessment of the strength of the initial prima facie case. United States v. Esparza-Gonzalez, 422 F.3d 897, 906-07 (9th Cir. 2005) (applying Hernandez and a case upon which it relied, U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983)).

The findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review. See Purkett v. Elem, 514 U.S. 765, 769 (1995). So are the findings of the state appellate court. See Mitleider, 391 F.3d at 1050. Under AEDPA, this means that where a challenge to the state court's factual determination is based on extrinsic evidence or evidence presented for the first time in federal court, under 28 U.S.C.

§ 2254(e)(1) the state court's findings of discriminatory intent are presumed sound unless the petitioner rebuts the presumption by clear and convincing evidence.  Kesser v. Cambra, 465 F.3d. 351, 368 n.1 (9th Cir. 2006).  Additionally, where review of the state court's factual determination is based entirely on information that was contained in the state court record, under 28 U.S.C. § 2254(d)(2) the federal court must defer to the state court's conclusion that there was no discrimination unless that finding was "'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  Cook, 593 F.3d 816 (citing 28 U.S.C. § 2254(d)(2)) (even though prosecutor gave both persuasive and unpersuasive justifications for strikes, court could not conclude state court's finding of no discrimination was objectively unreasonable where review of voir dire transcript and juror questionnaires showed the most significant justifications in each case were entirely sound); Kesser, 465 F.3d at 368 (finding California Court of Appeal's conclusion that a strike was not racially based was unreasonable determination under 28 U.S.C. § 2254(d)(2), and "even satisfies the more demanding standard" of § 2254(e)(1)).  Therefore, a federal habeas court can only grant habeas relief "if it was unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge." Rice, 546 U.S. at 338.  "[I]n evaluating habeas petitions premised on a Batson violation, 'our standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it.'"  Jamerson, 713 F.3d at 1225 (citing Briggs v.

United States District Court
For the Northern District of California

Grounds, 682 F.3d 1165, 1170 (9th Cir. 2012)).  The standard is demanding, but not insatiable.  Miller-El, 545 U.S. at 240.  A federal habeas court will not be bound by state court factual findings unsupported in the record or refuted by it, for example.  See e.g., Castellanos, 766 F.3d at 1149-50 (concluding that prosecutor's race-neutral reasons were pretextual after conducting comparative analysis and looking at totality of relevant circumstances); Kesser, 465 F.3d at 358 (granting writ based upon a finding that the California court in "failing to consider comparative evidence in the record before it that undeniably contradicted the prosecutor's purported motivations, unreasonably accepted his nonracial motives as genuine").

        4.   Analysis

    Because the trial court ruled on the ultimate question of intentional discrimination, this Court begins its federal habeas review at the second Batson step as to each of the six prospective jurors.  See Hernandez, 500 U.S. at 359.  The Court notes that the prosecutor offered the above-referenced race-neutral reasons for using his peremptory strikes of the six prospective jurors.  The Court therefore turns to the third Batson step and evaluates whether the state appellate court was objectively unreasonable in concluding that the trial court's credibility determination was supported by substantial evidence, Jamerson, 713 F.3d at 1225, and whether there is evidence of purposeful discrimination, see Hernandez, 500 U.S. at 355-62.  While the trial court and California Court of Appeal only informally reached the third step of the Batson analysis, this Court will look further into the third step and conduct a comparative juror analysis, and as

46

discussed below, it is clear there was no constitutional violation and there were proper race-neutral reasons for excusing the six prospective jurors.[7]

a.   Prospective Juror Number 61

The prosecutor indicated that his reason for a peremptory strike as to juror number 61 (an African-American female) was that "she was unable to follow the rule that the testimony of a single witness, if believed, is sufficient to prove any fact."  6RT 1071. As the prosecutor pointed out, the juror answered the "single witness rule question" by writing "no."  6RT 1071.  She further added "we would need more prove and witness [sic]."  2 Supplemental Clerk's Transcript ("SCT") 266.  The prosecutor stated that during oral voir dire, she heard the court expand on that rule, and was given the opportunity to "come down from that position, and, frankly, she did not."  6RT 1071.

The trial court concurred, stating "I did have the same concerns with her, . . . and her explanations weren't necessarily satisfactory."  6RT 1077.  The court stated that it understood how the prosecutor would have an issue with the juror, particularly "given the fact that, apparently, this case is going to rest greatly on the testimony of a single witness."  6RT 1077.  The court concluded that the explanation was "factually based and legally appropriate . . . ."  6RT 1077.

---

[7] Petitioner does not argue that the state courts used an improper legal standard.  Therefore, the California Court of Appeal opinion is entitled to AEDPA deference.  See Johnson v. Finn, 665 F.3d 1063, 1068-69 (9th Cir. 2011).

United States District Court
For the Northern District of California

Petitioner does not contest that juror number 61's inability to follow instructions is a valid reason for a challenge, but instead he argues that the record does not support the prosecutor's conclusion.  Petitioner claims that juror number 61 answered in the affirmative -- stating "Yeah" -- when asked in oral voir dire whether she could accept the testimony of a single witness.  2RT 317-318.

The record shows that the prosecutor consistently stated: "I find that when people fill out the questionnaire, they have a tendency to be a bit more honest about their true feelings than they do when they are responding to oral voir dire in open court in front of a large number of strangers . . . ."  6RT 1075; see Collins, 546 U.S. at 341 (prosecutor may reject statements made by juror in oral voir dire).  The prosecutor and the trial court had the first hand opportunity to observe the demeanor and tone of juror number 61, and both concluded that the juror's response did not "come down" from the previous "no" answer she gave to the question on the written questionnaire.

After carefully reviewing the record, the Court concludes that the state appellate court was not objectively unreasonable in concluding that the trial court's credibility determination was supported by substantial evidence.  Here, the prosecutor offered specific reasons for his challenges, which the trial court found credible.  The trial court's credibility determination was supported by substantial evidence in the record, and Petitioner has not presented clear and convincing evidence to the contrary.  Miller-El, 537 U.S. at 340.  These factual findings by the state court are therefore presumed correct.  Id.  Thus, presuming that

the prosecutor exercised his peremptory challenge in a race-neutral manner, the Court finds that there is no evidence of discriminatory intent or purpose.

Furthermore, a comparative juror analysis supports the finding that the challenge to juror number 61 was race-neutral and the prosecutor's reason was not pretextual. The prosecutor did not use a challenge for another self-described African-American, juror number 16, who also answered "no" to the "single witness" question. 2SCT 356. When the trial court asked her about the "single witness" rule, she stated that she could follow the law. 2RT 373. She further discussed her answer to the question, which included allusions to space aliens. 2RT 373. Nevertheless, when he had the chance, the prosecutor did not use a peremptory challenge on juror number 16. See 3RT 509 et seq. The juror was eventually excused by the court for hardship. 3RT 606. The prosecutor's decision to not use a challenge for juror number 16 supports the argument that his decision to strike juror number 61 was race-neutral, and he was not attempting to remove African-American jurors. The state appellate court was not objectively unreasonable in rejecting Petitioner's argument on direct appeal that comparative analysis showed a racial motive for the prosecutor's decision to strike juror number 61.

Petitioner has failed to show purposeful discrimination and that the state court opinion was an unreasonable application of Supreme Court authority. Accordingly, there has been no violation of the Equal Protection Clause as to the prosecutor's use of a peremptory strike on juror number 61.

b.    Prospective Juror Number 15

The prosecutor was concerned that juror number 15 (an African-American female) stated unambiguously that she could not disregard consideration of penalty or punishment.  6RT 1071. Contributing to the fear on the part of the prosecutor were two other factors: (1) that she believed "thugs were either demons or angels" and (2) that she greatly admired Albus Dumbledore from the Harry Potter book series.  6RT 1071.  The prosecutor felt the aforementioned contributed to the impression that juror number 15 would be "plagued by notions of punishment," and unable to give the prosecution a fair trial.  6RT 1071.

The trial court agreed, noting that all the aforementioned factors contributed to an impression that the juror could not follow the rule to disregard punishment.  6RT 1078.  Thus, the court concluded that the prosecutor's explanations were factually based, legally appropriate, and the actual basis for the challenge.  6RT 1078.

On direct appeal, Petitioner conceded that the prosecutor adequately rebutted the inference of group bias as to juror number 15.  Ex. A at 57.  Furthermore, Petitioner made no attempt to argue that a comparative analysis rebuts the trial court's factual finding that the prosecutor's explanation was the true basis for the challenge and that the challenge was race-neutral.

In sum, the juror unambiguously stated she could not disregard punishment, and made statements which reasonably gave rise in the prosecutor's mind to the feeling that the juror would impose her own standards.  Substantial evidence supported the court's ruling that the prosecutor's reasons were honest,

factually based and race-neutral.  Accordingly, Petitioner's
Batson claim as to juror number 15 fails to raise an equal
protection violation based on race.

        c.    Prospective Juror Number 29

    The prosecutor began by questioning juror number 29 (an
African-American male) regarding the statement in his
questionnaire about having been arrested and serving probation as
a young man.  4RT 763-765.  Juror number 29 explained that the
offense happened in rural Georgia, where he believed the police
and prosecutors were unethical and prejudiced against outsiders.
4RT 764 et seq.  The prosecutor then discussed juror number 29's
experiences with police after having been robbed recently in
Oakland.  4RT 766.  Juror number 29 stated, "I have some problems
with Oakland police."  4RT 766.  He described how a "white cop"
seemed callous, although a "Latino lady cop" showed a little more
compassion.  4RT 766-767.  Specifically, "the white cop" seemed to
take it lightly, laughed about the fact that three other people in
the neighborhood had been robbed within the hour, and said "it was
funny to him."  4RT 766.  When the prosecutor asked whether that
experience would affect the juror's ability to weigh the evidence
of a police officer, the juror referred to certain questionable
actions by the police that he had heard about, and concluded, "I
think it makes it hard for police, to try to believe them
sometime."  4RT 767.  The juror added, "Some officers I don't
think have done right by the community."  4RT 767.  When asked by
the prosecutor whether that makes it hard for some people to
believe them, the juror stated "That's correct."  4RT 767.  When
asked whether an Oakland police officer testifying would be at a

disadvantage, the juror stated "I think they may, probably would . . . ."  4RT 768.  Finally, juror number 29 displayed a negative attitude toward the prosecution by stating that he believed that the charging of the gun offenses, in addition to the murder offenses, was an "unfair" move by the prosecution.  4RT 780-786.  The trial court attempted several times to explain to the juror that charging decisions should not be taken into account, and that the prosecution may have had good reasons for charging the gun offenses.  4RT 780-786.  Juror number 29 eventually concluded that the prosecutor's charging the gun offenses was an invitation to the jury to compromise, and that he believed that the trial therefore may well turn out to be "unfair because of what the DA did."  4RT 786.

As mentioned above, the prosecutor explained that he exercised his peremptory challenge as to juror number 29 because of his negative view towards the Oakland Police Department, which was the department that handled Petitioner's case. 6RT 1072.  The prosecutor also noted that juror number 29 called into question the prosecutor's motive for filing the felon with a gun counts. 6RT 1072.  The trial court concluded that the prosecutor's explanation was the true basis for the challenge and that the challenge was factually based and race-neutral.  6RT 1078-1079.

Under California law, doubts about the veracity of police officers, stemming from personal experience, justify a peremptory challenge.  People v. Avila, 38 Cal.4th 491, 546-47 (2006).  Negative experiences with police alone is also a race-neutral explanation sufficient to withstand a Batson challenge.  See Cook

v. LaMarque, 593 F.3d 810, 820-21 (9th Cir. 2010) (prior negative experiences with law enforcement).

After reviewing the record and the analysis of the state courts, it is evident that the prosecution's reasons for striking juror number 29 were not pretextual. Petitioner has not shown clear and convincing evidence to rebut the presumption that the trial court's determination was correct. A comparative juror analysis further supports this conclusion. Petitioner has not presented any statements from seated jurors that are truly comparable to those of juror number 29. Ex. A at 57-58. Instead, the record shows a comparative juror analysis involving seated juror numbers 4 and 6 supports the finding that the challenge to juror number 29 was race-neutral. First, the written statement in the juror questionnaire by seated juror number 4 that she would not automatically believe the testimony of a law enforcement officer, with the parenthetical "(Mark Furman)," and her statement that she had a negative experience in getting two speeding tickets in the last ten years, are remarks that do not compare to the magnitude of those of prospective juror number 29. 1SCT at 54, 57. Meanwhile, while seated juror number 6 stated in his questionnaire that prosecutors "occasionally go over the line, especially if they have political aspirations, e.g. Elliot Spitzer," 1SCT 87, in oral voir dire, that prospective juror emphasized that this opinion would not affect his ability to be a fair and impartial juror, and that he had no general negative feelings about prosecutors. 6RT 1188-1189. This contrasted starkly with the responses of juror number 29, who never relented

United States District Court
For the Northern District of California

in his belief that the prosecutor in this very case was being unfair.

Accordingly, the prosecutor proffered race-neutral reasons for excusing juror number 29, and there is no evidence of discrimination after looking to the seated jurors who gave arguably similar answers. Therefore, Petitioner has failed to demonstrate any unreasonable application of established Supreme Court authority, and his Batson claim is denied as to juror number 29.

### d.   Prospective Juror Number 25

The prosecutor had three concerns about juror number 25 (an African-American female); the first was that she had been fired from Home Depot for mishandling a cash transaction. 3RT 635; 6RT 1072. The prosecutor found juror number 25's explanation "confusing," and stated that he was "concerned" because it suggested someone who was not completely honest and who could not be fair to the prosecution. 6RT 1071-1073. The prosecutor's belief that the juror may have been dishonest, both at her job and in her explanation to the prosecutor, made it difficult for the prosecutor to trust the juror's other answers, justifying the challenge. See Cook, 593 F.3d at 823 (preemptory used to strike juror who misrepresented salient facts of criminal experience to court; stated reason was not pretext, and race was not substantial or motivating factor for strike).

Second, the prosecutor was concerned about the juror's written statement that she had applied for law enforcement jobs, including at the Alameda County Sheriff's Department, but had been rejected. 3RT 637; 6RT 1073. The prosecutor stated that those

54

United States District Court
For the Northern District of California

1    who have such an experience "oftentimes develop an anti-law

2    enforcement bias which derives from that rejection."  6RT 1073.

3    Hostility toward law enforcement or the prosecution that

4    reasonably might flow from a job rejection is a valid race-neutral

5    reason for a challenge.

6         Finally, the prosecutor noted that juror number 25's

7    university degree in corrections, pursuit of a job in corrections,

8    and "fascination with criminals" was "troubling" and he "did not

9    feel she would be a fair and impartial juror for the prosecution

10   in this case."  3RT 638-639; 6RT 1073.  However,

11   the state appellate court chose not to discuss whether these

12   reasons for recusal were genuine because the trial court did not

13   base its ruling on such reasons.  _Thompson_, 2010 WL 3789138, at

14   *13 n.12.

15        Petitioner again fails to rebut the trial court's factual

16   finding that the prosecutor's explanation was the true basis for

17   the challenge and that the challenge was race-neutral.

18   Accordingly, there has been no violation of the Equal Protection

19   Clause as to Petitioner's _Batson_ claim relating to juror number

20   25.

21              e.   Prospective Juror Number 78

22        The prosecutor noted two problems with juror number 78 (an

23   African-American female): (1) in her written questionnaire she

24   stated that could not pass judgment on any individual because that

25   is "God's duty"; and (2) she had been prosecuted for welfare

26

27

28

**United States District Court**
For the Northern District of California

fraud[8] by the prosecutor's own district attorney's office.  6RT
1073-1074.  The trial court affirmed the prosecutor's impression
that juror number 78 had not disavowed her original statement of
unwillingness to pass judgment, and acknowledged the prosecutor's
reasonable unease with his office's having prosecuted the juror.
6RT 1080.  Here, Petitioner has not shown clear and convincing
evidence to rebut the presumption that the trial court's
determination was correct, or shown why this Court should favor
Petitioner's interpretation of the record over the trial court's
credibility determination.  See Mitleider, 391 F.3d at 1048-49
(reluctance to serve on jury is legitimate reason to strike
juror); United States v. Power, 881 F.2d 733 (9th Cir. 1989)
(perceived hostility toward government is a valid factor).

A comparative juror analysis further does not raise an
inference of discrimination.  The record supports a finding that
none of the seated jurors was similarly situated to the juror
number 78.  On direct appeal, Petitioner attempted to challenge
the prosecutor's reasons with comparative analysis, but apparently
could find no similar statement of ambiguous unwillingness to
judge by any other juror on the panel.  Ex. A at 59.  The Court
therefore focuses on Petitioner's challenge to the second reason
given by the prosecutor, in which he claimed on direct appeal that
certain seated jurors had similar experience with the District
Attorney's Office.  Id.  For example, seated juror number 11

[8] On being asked about her criminal conviction, juror number
78 stated that she was prosecuted for welfare fraud in Alameda
County, and received a misdemeanor conviction as a result of a
plea bargain, which resulted in a two-week jail term, restitution,
and a term of probation.  5RT 957-958.

United States District Court
For the Northern District of California

(initially prospective juror number 73 and a self-described "Mexican" male) stated that he spent three days in jail after he pleaded no contest to a domestic violence charge.  2RT 382, 1SCT 151, 159.  The fact that seated juror number 11 had this experience is not conclusive evidence that the only factor differentiating him from the challenged juror number 78 was race. Numerous other factors are present.  First, unlike juror number 78, seated juror number 11 did not have any other disqualifying factors, and in particular did not state in his questionnaire that he held any religious beliefs that might affect his ability to serve as a juror.  1SCT 155.  Next, seated juror number 11's prosecution was initiated by his ex-wife, not by the police or an outside government agency as was the case with juror number 78. 1SCT 159; 2RT 382-383.  Seated juror number 11 expressly blamed his defense attorney who "wasn't prepared," but said "everyone treated [him] fairly."  2RT 383.  Juror number 78 also did not have the mitigating factor present in seated juror number 11's history of having been the victim of a violent crime in Oakland, i.e., seated juror number 11 had been carjacked at gunpoint three years prior.  2RT 380-382.  Seated juror number 11 stated that he reported the incident to the police, they investigated it, and, while they did not catch the carjacker, they found the car the following day.  2RT 381.  Seated juror number 11 claimed that nothing about the carjacking incident affected his ability to be fair and impartial.  2RT 381.  The prosecutor may have judged that such an experience would outweigh any previous resentment of the police the juror might have felt from being arrested for the domestic violence charge.  See 2RT 380-382.  For all of these

reasons, the experiences of the two jurors were not comparable. Therefore, Petitioner's attempt to use comparative analysis to challenge the prosecutor's second reason as to seated juror number 11 is, at best, inconclusive, not clear and convincing as required by 28 U.S.C. § 2254(e)(1).

On direct appeal, Petitioner further attempted to challenge the prosecutor's second reason by stating that juror number 78's conviction for welfare fraud is "nothing short of pedestrian among these panelists and their family members" and cited certain portions of the record.  Ex. A at 59.  Petitioner cited "2RT 250-258," and only one juror (juror number 57) in those pages indicated any negative experience with the Oakland Police Department, and that juror was immediately excused for cause.  2RT 258.  Next, Petitioner cited the voir dire of juror numbers 65, 21, 7, 49, and 10, but because these were not seated jurors, any comparison is unconvincing; it is not clear that the prosecutor would not have challenged them had it been necessary to do so. See 2RT 408, 438; 3RT 515-520; 4RT 728; 4RT 751-752; 5RT 998; see People v. Lenix, 44 Cal. 4th 602, 631 (2008); see also Cook v. Lamarque, 593 F.3d 810, 815 (9th Cir. 2010) (comparative analysis requires "side-by-side comparisons" of the minority panelists who were struck and the white panelists who were allowed to serve). Meanwhile, certain seated jurors or their family members were either cited or arrested: (1) seated juror number 8 was cited for discharging a firearm in a restricted area and successfully defended himself in federal court, 3RT 548-552; (2) seated juror number 1 received a citation for holding a beer in public twenty-five years ago, 4RT 834; and (3) the son of alternate juror number

3 was arrested due to a "drug problem," 1SCT 219.  However, all the aforementioned instances are distinguishable from the prosecutor's uneasiness with the prosecution of juror number 78 by his own office.

Taking all the aforementioned into account, the Court concludes that Petitioner has not shown that his constitutional rights were violated, and that the state appellate court's decision was "plainly not unreasonable." Felkner, 562 U.S. at 598.  At a minimum, Petitioner's Batson claim relating to juror number 78 is denied because he has failed to show that there was "no reasonable basis for the state court to deny relief." Harrington v. Richter, 562 U.S. 86, 98 (2011).  That is, Petitioner has not shown that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.  See 28 U.S.C. § 2254(d).

### f.    Prospective Juror Number 4

The prosecutor stated that juror number 4 (an African American female) had "serious issues with police officers," which stemmed from being in a relationship with an Oakland police officer who apparently participated in "improper and illegal" acts.  6RT 1074.  The prosecutor further noted that juror number 4 made a reference to the "Riders" cases,[9] and to the opinions she has formed about Oakland Police Department.  6RT 1074.  The

---

[9] Delphine Allen, et al. v. City of Oakland, et al., consolidated case number C00-4599 TEH (JL) is known as the "Riders" cases, which dealt with a suit against four police officers who worked the night shift in West Oakland (the self-named "Riders") and allegedly abused their authority by using unlawful force, planting evidence and fabricating police reports.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

prosecutor noted that, while she tried to back away from the
implications of the "Riders" cases in oral voir dire, he tended to
believe her bias against police officers in her written
questionnaire. 6RT 1075. The prosecutor also noted juror number
4's belief that her son was improperly arrested at his jobsite.
6RT 1075-1076. The trial court stated that it agreed with the
prosecutor's opinion that juror number 4's views about the Oakland
Police Department were a serious concern. 6RT 1080. The court
noted the juror's "incredibly negative opinion" of the Oakland
police officer with whom she had had a relationship, who committed
crimes against her, and who described the misbehavior of his
fellow officers and himself on the job. 6RT 1081. The court
further noted that these experiences showed that she had "very,
very strong feelings about the Oakland Police Department that were
completely negative." 6RT 1080-1081.

These concerns were borne out by juror number 4's voir dire.
She stated she believed there was a lot of corruption in the
Oakland Police Department, and referred to the "Riders" cases.
See 5RT 982-984, 4SCT 989. The Oakland Police Officer she was in a
relationship with pulled a gun on her and told her to take her
clothes off, and that incident ended their relationship. 5RT 967.
Twenty years later, juror number 4 came to believe that same
officer had been involved with the murder of a woman. 5RT 967-
968. She stated that police officers were "brainwashed," meaning
they believe that "[e]verybody is guilty until proven
innocent . . . ." 5RT 966. Finally, juror number 4 claimed that
her son was arrested and falsely accused, and the charges were
dropped for "insufficient cause." 5RT 977-980. Juror number 4

believed her son was "treated unfair[ly]" by the criminal justice system.  5RT 979.  All of this negative experience with law enforcement was an acceptable reason to strike juror number 4.  See Mitleider, 391 F.3d at 1048–49.  Furthermore, that a potential juror has a relative who has been convicted of a crime and is dissatisfied with how that relative has been treated are race-neutral reasons for striking that juror.  See, e.g., id. at 1048 (brother's conviction for cocaine possession was facially neutral reason for challenging juror); United States v. Vaccaro, 816 F.2d 443, 457 (9th Cir. 1987) ("reasonable" to challenge black juror whose brother was in prison for armed robbery), overruled on other grounds by Huddleston v. United States, 485 U.S. 681 (1988).  The state court found that the prosecutor's statement of reasons was race-neutral and was "the actual basis for the challenge."  6RT 1081.

There is no merit to Petitioner's argument that the prosecution was motivated by race because seated juror numbers 4 and 6 also had negative experiences with law enforcement, and other retained jurors had family or friends who had been arrested or convicted of a crime.  See Ex. A at 59–60.  As to seated juror numbers 4 and 6, the Court has discussed above how these seated jurors' mild negative experiences with law enforcement and prosecutors contrasted with the responses of juror number 29, who believed the prosecutor in Petitioner's case was being unfair.  Here, there is an even starker contrast between prospective juror number 4's "completely negative" experiences with the Oakland Police Department and seated juror numbers 4 and 6's experiences.  Similarly, the Court has found unavailing Petitioner's comparative

juror analysis argument relating to juror number 78's conviction for welfare fraud; for the same reasons, it finds unavailing Petitioner's argument that "the prosecutor's assertion of [juror number 4's] son's bare arrest on an unfounded accusation as indicative of bias is dubious for the reasons set forth in connection with Juror No. 78." See Ex. A at 60.  Accordingly, Petitioner is not entitled to habeas relief on his Batson claim relating to prospective juror number 4.

In sum, the state appellate court was not unreasonable in finding that the prosecution's reasons for striking prospective juror numbers 61, 15, 29, 25, 78 and 4 were not pretextual.  The Court concludes that the state appellate court's rejection of Petitioner's Batson claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

D.   Prosecutorial Misconduct

Petitioner claims that the prosecutor committed misconduct based on the following three allegedly improper and prejudicial arguments: (1) characterizing Petitioner and Coleman as pack animals stalking their prey; (2) referring to their status as convicted felons; and (3) appealing to the jury's passions and prejudices.

1.   Applicable Federal Law

Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate standard of review is the narrow one of due process, not a broad exercise of supervisory power.  Darden v.

Wainwright, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  Id.  Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness.  Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005); see also Deck v. Jenkins, 768 F.3d 1015, 1023 (9th Cir. 2014) (recognizing that Darden is the clearly established federal law regarding a prosecutor's improper comments for AEDPA review purposes).  The court decides a prosecutorial misconduct claim "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995).  In determining whether the misconduct violated due process, a court may take into account the weight of the evidence of guilt, whether the misconduct relates to a critical part of the case, whether the prosecutor's comment misstates or manipulates the evidence, and whether the defense invited the error.  United States v. Young, 470 U.S. 1, 19 (1985).  Another factor in determining if misconduct amounted to a violation of due process is whether the trial court issued a curative instruction.  When a curative instruction is issued, a court presumes that the jury has disregarded inadmissible evidence and that no due process violation occurred.  See Greer v. Miller, 483 U.S. 756, 766 n.8 (1987).  This presumption may be overcome if there is an "overwhelming probability" that the jury would be unable to disregard evidence and a strong likelihood that the effect of the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

misconduct would be "devastating" to the defendant.  See id.

In determining whether prosecutorial misconduct warrants habeas relief, the reviewing federal court should examine whether the error had a substantial and injurious influence upon the jury's verdict.  Brecht, 507 U.S. at 637.

> 2.   Comparison of Petitioner and Co-Defendant's Behavior to Animals

> a.   Background Facts

Petitioner first cites comments by the prosecutor comparing Petitioner's and Coleman's herding and stalking of the victims to the hunting behavior of animals:

> And [the victims] don't get far because the armed WL [Petitioner] and Moon[ie] [Coleman] begin to pursue them -- the way lionesses pursue their prey, the way wolves stalk caribou -- working as a team, WL on the flank, Moon[ie] coming up from behind. Not solitary predators like tigers, but pack animals hunting as a team – aiding and abetting each other, strength in numbers, employing a group strategy to achieve a common goal.

12RT 2415.

Defense counsel for Petitioner and Coleman told the jury in closing argument that such remarks accused Petitioner and Coleman of being animals, and both pointed out that neither Petitioner nor Coleman was an animal.  See 12RT 2447 (Petitioner's counsel), 12RT 2477-2479 (Coleman's counsel).  The prosecutor responded in his closing with indignation, pointing out that he had not called them animals, stating:  "They are not [animals].  They are men.  You see, animals are not responsible in our criminal justice system for doing what nature dictates, as animals, that they do."  12RT 2544.  The prosecutor continued that the hunting analogy was "absolutely appropriate because it describes their behavior.  But as men, not as animals, they are accountable for their behavior."

Ibid.

### b.    State Court Opinion

The California Court of Appeal rejected the claim as follows:

Defendants argue the prosecutor committed prejudicial misconduct by "repeatedly characteriz[ing] [defendants] as pack 'animals' stalking their prey up the street."  However, defendants' failure to object to the comments forfeits any challenge on appeal.  "'[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion -- and on the same ground -- the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]'  [Citation.]" (Stanley, supra, 39 Cal. 4th at p. 952.)  In any event, we see no prejudicial misconduct.

"'"[C]ounsel during summation may state matters . . . which are common knowledge or are illustrations drawn from common experience, history or literature." [Citation.]  "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness" [citation], and he may 'use appropriate epithets . . . .'"'  [Citation.]"  (People v. Williams (1997) 16 Cal. 4th 153, 221.)  Here, the prosecutor's analogizing defendants' conduct to the behavior of animals hunting prey was consistent with the People's theory -- that defendants armed themselves with loaded firearms and followed the victims as they were attempting to leave The Village to avoid trouble with defendants.  (See People v. Jones (1970) 7 Cal. App. 3d 358, 362 [prosecutor's remarks that defendant had "animalistic tendencies" and "felonious tendencies" were within bounds of legitimate argument and not misconduct as the attack on the victim was "indeed felonious and consistent with animalistic tendencies, i.e., pursuit and vicious attack without provocation"]; see also People v. San Nicolas (2004) 34 Cal. 4th 614, 665-666 [court found nonprejudicial prosecutor's use of numerous epithets and derogatory language in closing argument, including references to defendant as "that animal"].)

Thompson, 2010 WL 3789138, at *17.

### c.    Analysis

Respondent contends that Petitioner's first claim of prosecutorial misconduct is procedurally defaulted because at trial neither an objection to the alleged misconduct, nor a request for an admonition, was made.  Doc. no. 7 at 47.

Petitioner makes no response to the procedural bar asserted by Respondent.

A federal court, as a matter of comity and federalism, will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment. See Coleman v. Thompson, 501 U.S. 722, 729-30 (1991). In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. Id. at 750. The Ninth Circuit has held that a federal court cannot review a claim of prosecutorial misconduct if the petitioner has procedurally defaulted the claim by failing to make a contemporaneous objection in the trial court. See Jackson v. Giurbino, 364 F.3d 1002, 1006–07 (9th Cir. 2004). Because this is precisely what happened here, and because Petitioner has not attempted to show cause and prejudice or that failure to consider his prosecutorial misconduct claim will result in a fundamental miscarriage of justice, this Court is barred from considering Petitioner's first claim of prosecutorial misconduct. Coleman, 501 U.S. at 750.

Even if Petitioner's claim were not procedurally defaulted, it would fail on the merits. As noted above, the state appellate court found that Petitioner had failed to preserve his first prosecutorial misconduct claim for appeal, but went on to reject

United States District Court
For the Northern District of California

the claim on its merits.  The prosecutor's challenged argument
here was not of the type that necessarily infects a trial with
such unfairness that a resulting conviction violates due process,
because it was a description of the concerted actions by
Petitioner and Coleman, related to the evidence admitted at trial,
and did not manipulate or misstate the evidence.  See Darden, 477
U.S. at 182.  Thus, the state appellate court reasonably rejected
Petitioner's first prosecutorial misconduct claim, consistent with
applicable Supreme Court precedent, and no relief is available.
Finally, any error was harmless under Brecht.

> 3.   Reference to Petitioner's and Coleman's Status as
>      Felons

> a.   Background Facts

As mentioned above with respect to Petitioner's claim that
the trial court erred in denying his motion to sever or bifurcate,
Petitioner takes issue with the prosecutor's misuse of the prior
conviction evidence.  See supra Discussion I.B.  The exact
argument made by the prosecutor was as follows:

> You heard Matthew [Cobbs] talk about stashing guns in the
> village, he had seen WL [Petitioner] and Moon[ie] [Coleman]
> stash guns before.  They were both convicted felons, so
> presumably they didn't want to get pulled over in a car with
> guns.  Matthew saw no guns in the car, he certainly would
> have seen that rifle.

12RT 2414.

> b.   State Court Opinion

As with Petitioner's first prosecutorial misconduct claim,
the state appellate court determined that both defense counsel's
failure to object to the aforementioned argument procedurally
defaulted the second prosecutorial misconduct claim relating to
the prosecutor's reference to Petitioner's status as a convicted

felon.  Thompson, 2010 WL 3789138, at *18.  Even so, the court

still found no due process violation, stating:

> Both defense counsel listened to the prosecutor's closing
> remarks and did not object to the remarks, which suggests
> "'"the potential for [prejudice] argued now was not apparent
> to one on the spot."'  [Citation.]"  (People v. Young (2005)
> 34 Cal. 4th 1149, 1203 (Young).)  Additionally, the court
> instructed the jurors to consider the evidence of defendants'
> felon status for a limited purpose, and any statements made
> by counsel that conflicted with the court's instructions must
> be disregarded.  In the absence of any indication to the
> contrary, we presume the jury followed the court's
> instruction to consider defendants' status as convicted
> felons only on the issue of whether they were guilty of
> possessing firearms as felons.

Id. at *17.

### c.   Analysis

On the whole, the prosecutor's comment that Petitioner and

Coleman were felons cannot be said to have "so infect[ed] the

trial with unfairness as to make the resulting conviction a denial

of due process."  Darden, 477 U.S. at 181.  The fact that

Petitioner and Coleman were felons had little impact on the case.

The testimony of Cobbs, one of the primary prosecution witnesses,

revealed that The Village was a high-crime neighborhood where he

needed to protect himself from "people coming there [and]

shooting."  9RT 1850.  Cobbs himself admitted to having multiple

felony convictions.  9RT 1842-1843.  Cobbs further testified that

he habitually hid guns in The Village because he was often stopped

by the police and frisked, and he did not want to have a gun in

his possession when he was frisked.  9RT 1851-1852.  Further,

Cobbs testified that he had seen both Petitioner and Coleman stash

guns in The Village.  9RT 1881.  The prosecutor's comment that

Petitioner and Coleman were convicted felons, who did not want to

be pulled over in a car with guns, helped to explain why they

chose to stash their guns in the bushes in The Village.
Accordingly, the fact that the prosecutor mentioned that
Petitioner and Coleman had been convicted of some undated,
unspecified felony would not have inflamed the jury against them.
Further, the comment was never again highlighted or brought to the
jury's attention.

As mentioned above, the jury was eventually instructed on the
elements of the charge of being a felon in possession of a firearm
under California Penal Code section 12021, and as part of those
instructions, the jury was told of Petitioner's stipulation that
he "has suffered a prior conviction as alleged" in the
information.  12RT 2594-2595.  The trial court instructed the jury
that the previous felony conviction, having been established by
stipulation, was proved, and that the jury must accept it.  12RT
2594.  As part of those instructions, the court also instructed
the jury:

> Do not speculate as to the nature of the prior conviction.
> That is a matter which is irrelevant and should not enter
> into your deliberations.  You must not be prejudiced against
> a defendant because of a prior conviction.  You must not
> consider that evidence for any purpose other than for
> establishing a necessary element of the crime charged.

12RT 2595.

The state appellate court acknowledged that the trial court
had given the instructions that the jurors consider the evidence
of defendants' felon status for a limited purpose and that any
statements made by counsel that conflicted with the court's
instructions must be disregarded.  Thompson, 2010 WL 3789138, at
*17.  The state appellate court then presumed that the jury
followed the court's instructions, and thus rejected this claim.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Petitioner is not entitled to federal habeas relief on his prosecutorial misconduct claim relating to the comment on his status as a felon because the state appellate court's rejection of this claim cannot be said to have been objectively unreasonable. See 28 U.S.C. § 2254(d).

4.   Appeals to Jurors to Do Justice

a.   Background Facts

Finally, Petitioner points to the prosecutor's argument that the jury had a responsibility to do justice.  As shown in the excerpt below, the argument elicited objections from both defense counsel, an admonition from the trial court, and a response by the prosecutor:

MR. LAMIERO: . . . And I ask you for justice.  Not necessarily for Dante Wallace or Ronnell Hodge, I don't know what justice would matter to them.  You know, we are not in the metaphysical realm, we're here with our feet on the ground, so I don't even begin to even understand what justice could mean to them or to their memory.

But you know a lot of decent people live in that very troubled village, some of them came in and you had an opportunity to meet them -- Ms. Shahid, the Wallaces -- people that work hard, do the right thing, and live in a community plagued by criminals, plagued by gunfire, plagued by killing.  And you have learned that in this trial about the Village, you learned about the frequency of the gunshots, you learned about the shootings and the aftermath of the shootings.

Well, who is it that gets to decide the quality of life in a given community?  Is it people like WL [Petitioner] and Moon[ie] [Coleman]?  Do they get to decide what kind of a community people are going to live in, where they have people being gunned down outside their windows in the middle of the night, where they see their children dying in the street, is that who gets to decide?  And is that the kind of society we want to have where communities are just sort of left to the plague of gun violence?

See, I ask you for justice in and of itself.  Justice is an appropriate and a laudable goal.  But think about those folks who will go home to the Village tonight.  I ask you for justice as representatives of a community, which is what you

United States District Court
For the Northern District of California

are, you're representatives of this community.

You don't live in the Village, but you are drawn from the broader community, and you have a responsibility.  And the responsibility is to make a decision in this case that is just and appropriate.  It's based on the evidence presented, and you have an opportunity to make the right decision and to communicate through that decision a message to not only these men but the community that they and those like them have so terribly plagued.

MR. COLE: Your Honor, I have to object.

MS. BELES: I object.

MR. COLE: This is an appeal to passion and prejudice about sending messages to people --

MS. BELES: Join.

MR. COLE: -- it has nothing to do with the law.

THE COURT: As I told you before, you are the judges of the facts, and it's your decision as to what the facts are as they may apply to the elements of the offenses.
And go ahead, Mr. Lamiero.

MR. LAMIERO: It has everything to do with your responsibility as representatives of the community.  So I ask you for, I ask you for justice in this case.  And with that, I thank you.

12RT 2419-2421.

Defense counsel for Petitioner and Coleman did not request

the trial court to further admonish the jury to disregard the

prosecutor's comments, and instead counsel each rebutted these

comments in their arguments, Petitioner's counsel stated as

follows:

The system produces justice.  It is not anybody's role and not your role to decide, oh, well, we're going to do justice here.  What you are supposed to do is decide what the facts are and apply the law.

Once anybody in this courtroom decides that they are going to administer justice, they are engaging in a -- they are doing something that could take the whole system off track.

And so this is not about you sending messages or me or the Court or anybody else sending messages to anybody.  This is not about the situation out in this community.  This is about these two men and whether this district attorney has

71

**United States District Court**
For the Northern District of California

presented enough evidence to persuade you beyond a reasonable
doubt that these two men committed the crimes that they are
accused of.

That's what everybody's role is, nobody here is Western
Union.  There used to be -- I forget what the context was --
you want to send a message, talk to Western Union.  This is
not about sending messages or curing the ills of this
society.  This is about whether these two guys have been
proven guilty beyond a reasonable doubt.

Now, that is what's going on.

12RT 2423.

Coleman's counsel responded similarly, stating in part:

This case is not about cleaning up Oakland, it's not about
cleaning up a neighborhood, it's not about sending a message.
It's trying to figure out to the best of our ability whether
we can determine beyond a reasonable doubt that a crime was
committed.

12RT 2469.

Finally, the prosecutor responded in his rebuttal closing

argument by admitting that he "always hate[s] it when, you know,

in a murder case [he] gets up and [he] talk[s] about the

responsibilities of a jury as representatives of that community."

12RT 2550.  He then also pointed out that defense counsel "hate

that."  12RT 2550.  He then concluded by stating:

. . . Well, you know, it's kind of just the way it is, it's
true.  That's our system of justice.  And, yes, I do ask you
for justice, because in this case justice is holding these
men accountable for their transgressions in our community.

And so I ask you to find these defendants guilty not only
because that is what the evidence has shown, but because of
the fact that the evidence has shown that makes only guilty
verdicts a just and appropriate outcome in this trial.

So I thank you.

12RT 2550-2551.

The trial court further instructed the jury in its main

charge as follows:

You must accept and follow the law as I state it to you

United States District Court
For the Northern District of California

regardless of whether you agree with it.  If anything
concerning the law said by the attorneys in their arguments
or at any other time during the trial conflicts with my
instructions on the law, you must follow my instructions.

You must not be influenced by pity for or prejudice
against a defendant.  You must not be biased against a
defendant because he's been arrested for this offense,
charged with a crime, or brought to trial.  None of these
circumstances is evidence of guilt, and you must not infer or
assume from any or all of them that a defendant is more
likely to be guilty than not guilty.

You must not be influenced by sentiment, conjecture,
sympathy, passion, prejudice, public opinion, or public
feeling.  Both the people and the defendant have a right to
expect that you will conscientiously consider and weigh the
evidence, apply the law, and reach a just verdict regardless
of the consequences.

12RT 2553.  The trial court also instructed the jury to "decide

all questions of fact in this case from the evidence received in

this trial and not from any other source."  12RT 2555.

   b.   State Court Opinion

The Court of Appeal rejected this claim, stating:

. . . [T]he language used by the prosecutor in this case was
similar to the nonprejudicial comments made by the prosecutor
in Adanandus, supra, 157 Cal. App. 4th 496.  In that case,
the police responded to a shooting on 65th Avenue in Oakland.
(Id. at p. 499.)  Multiple shots were fired from a passing
minivan into a station wagon parked in a driveway.  (Ibid.)
There were three men in the station wagon; one man was killed
and another man was shot in the arm.  (Ibid.)  Defendant, who
was later identified as the shooter, was charged with first
degree murder and first degree attempted murder, as well as a
driveby special allegation, and an allegation of personal and
intentional use of a firearm causing great bodily injury.
(Ibid.)  In his closing remarks, the prosecutor initially
told the jury, "'With your verdicts in this case, I'm not
asking you to bring [the victim] back to his mother; that's
not possible.  But what you can do with your verdicts in this
case is you can restore order.  The sense of order, the sense
of law, the 2500 block of 65th Avenue in the City of Oakland,
because it certainly wasn't there on April 19, 2005, when
[defendant] was, to use his own words, "going down the line,"
he was going to leave more bodies on the map.'  The
prosecutor returned to his law and order theme as he
concluded his argument: 'Ladies and gentlemen, the 2500 block
of 65th Avenue . . . had no concept of law and order.  None
whatsoever . . . . [¶]  What you can do [by your verdicts]
is restore justice to that street.  That street on that day

73

was without justice . . . . [¶] . . . [¶] You, as jurors
in this case, have taken an obligation and oath to uphold the
law.  Believe in the law.  Restore the law to the 2500 block
of 65th Avenue, those are the only true and correct verdicts
in this case, and I am confident and believe that you'll
return those verdicts.'"  (<u>Id.</u> at pp. 511-512.)  In ruling
the prosecutor's quoted comments did not constitute
misconduct, this court stated: "[I]t 'is permissible to
comment on the serious and increasing menace of criminal
conduct and the necessity of a strong sense of duty on the
part of jurors.  [Citation.]  The prosecution may properly
urge his points vigorously as long as he does not act
unfairly.'  [Citation.]  The prosecution's references to the
idea of restoring law and order to the community were an
appeal for the jury to take its duty seriously, rather than
efforts to incite the jury against defendant.  Thus, [the
remarks] were not misconduct.  (<u>People v. Wash</u> (1993) 6 Cal.
4th 215, 261-262 [no misconduct where prosecutor urged 'jury
"to make a statement," to do "the right thing," and to
restore "confidence" in the criminal justice system by
returning a verdict of death']; <u>People v. Lang</u> (1989) 49 Cal.
3d 991, 1041 [prosecutor's remarks that 'if you want to have
a voice in your community and an effect upon the law in the
community, this is your opportunity' (italics omitted) not
improper because '[n]o reasonable juror would have construed
the remarks as urging the jurors to follow community
sentiment rather than their own judgment'].)"  (<u>Adanandus</u>,
157 Cal. App. 4th at p. 513; <u>see</u> <u>People v. Carpenter</u> (1997)
15 Cal. 4th 312, 397 [prosecutor's references to the "measure
of a society" did not inject issues broader than defendant's
guilt and invite the jury to render a verdict based on public
opinion].)

Even if the prosecutor's arguments in this case might be
interpreted as an improper appeal to the jury's passions and
prejudices, they could not, by themselves, have unduly
persuaded the jury.  The prosecutor's comments about the
nature of the community in which the shootings took place
were based on the evidence presented at trial.  When defense
counsel objected to the prosecutor's comment that the jury
should send a message, the court informed the jurors they
were "the judges of the facts, and it's your decision as to
what the facts are as they may apply to the elements of the
offenses."  The prosecutor's remarks following this
admonition did not repeat the challenged argument.  Both
defense counsel expressly and forcibly responded to the
prosecutor's comments in their closing arguments.  Before
deliberations the court instructed the jury it "must not be
influenced by pity for or prejudice against a defendant," or
"by sentiment, conjecture, sympathy, passion, prejudice,
public opinion or public feeling."  "[W]e presume the jury
relied on the instructions, not the arguments, in convicting
defendant[s]." (<u>People v. Morales</u> (2001) 25 Cal. 4th 34, 47.)
Nothing in the record indicates the jurors did anything other
than focus on the evidence and the court's instructions in
reaching their verdicts.  Viewing the prosecutor's comments

United States District Court
For the Northern District of California

74

in context, and in their entirety, we do not believe "there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (Id. at p. 44.)[FN 13]

[FN13:] "Because any possible misconduct was harmless on this record, [defendants'] claim[s] of ineffective assistance of trial counsel lack [] merit." (People v. Coffman and Marlow (2004) 34 Cal. 4th 1, 95 (Coffman and Marlow).) "[C]ompetent counsel may often choose to forgo even a valid objection. '[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal.' [Citation.]" (People v. Riel (2000) 22 Cal. 4th 1153, 1197.)

Thompson, 2010 WL 3789138, at *18-19 (footnote in original).

        c.    Analysis

A prosecutor's exhortation to the jury to join in the war against crime may constitute prejudicial misconduct. See United States v. Polizzi, 801 F.2d 1543, 1558 (9th Cir. 1986) (citing Hance v. Zant, 696 F.2d 950 (11th Cir. 1983)). However, an appeal to the jury to be the "conscience of the community" is not impermissible unless it is specifically designed to inflame the jury. See United States v. Koon, 34 F.3d 1416, 1444 (9th Cir. 1994), rev'd on other grounds by 518 U.S. 81 (1996). No prejudicial error will be found where the comment is isolated and the court instructs the jury that its function is to determine guilt or innocence based on the evidence of the case, and that the statements of counsel are not evidence. See id.

In the present case, the prosecutor made an appeal to the jury, asking them for "justice as representatives of the community." 12RT 2420. However, such an appeal was permissible because it was not designed to inflame the jury and instead seemed more geared toward urging the jury to take its duty seriously.

See <u>Koon</u>, 34 F.3d at 1444.  Moreover, the trial court instructed the jury that the facts must be determined only from the evidence presented at trial, and that the attorneys' comments were not evidence.  12RT 2553, 2555.  There is an "almost invariable assumption of the law that jurors follow their instructions," <u>Richardson v. Marsh</u>, 481 U.S. 200, 206 (1987), and nothing suggests that the jurors here did otherwise.  On this record, the prosecutor did not appeal to the jury to convict Petitioner other than on the evidence presented at trial.  But even if the remark is deemed improper, Petitioner is not entitled to habeas relief because he has not shown that it rendered his trial fundamentally unfair.  It is not enough that a prosecutor's remarks were undesirable or even universally condemned.  <u>See Darden</u>, 477 U.S. at 181.  Rather, Petitioner must show that they so infected the trial with unfairness as to make the resulting conviction a denial of due process.  <u>See id.</u>  He has failed to do so.

Accordingly, the state appellate court reasonably applied controlling law in ruling that Petitioner was not denied a fair trial by the prosecutor's statements appealing to the jurors to do justice.  Finally, any error had no substantial or injurious effect on the verdict.  Therefore, Petitioner is not entitled to habeas relief on his third prosecutorial misconduct claim.

E.   Jury Instruction Claims

Petitioner raises the following claims of instructional error due to the trial court's: (1) failure to instruct the jury that in order for the multiple murder special circumstance to apply to him

United States District Court
For the Northern District of California

he had actually to kill or intend to kill both victims[10];

(2) erroneous instructions on self-defense and unreasonable self-

defense; (3) erroneous instruction on accomplice liability and the

natural and probable consequences doctrine; (4) erroneous

instruction on conspiracy liability in that there was no evidence

of any conspiracy; (5) erroneous instruction on voluntary

intoxication; and (6) erroneous instruction relating to impeached

witnesses.[11]

    1.   Applicable Federal Law

    A determination that there is a reasonable likelihood that

the jury has applied the challenged instruction in a way that

violates the Constitution establishes only that an error has

occurred.  Calderon v. Coleman, 525 U.S. 141, 146 (1998).

    The instruction may not be judged in artificial isolation,

but must be considered in the context of the instructions as a

whole and the trial record.  Estelle v. McGuire, 502 U.S. 62, 72

(1991); Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995).

    Due process requires that "'criminal defendants be afforded a

meaningful opportunity to present a complete defense.'"  Clark v.

Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quoting California v.

_____

    [10] The Court has found above that Petitioner is not entitled
relief based on his instructional error claim relating to the
multiple murder special circumstance.  See supra Discussion I.A.2.
Therefore, the Court need not repeat its analysis here.

    [11] On direct appeal, Petitioner also claimed the trial court
erroneously instructed the jury on the definition of "due caution
and circumspection" using language in CALJIC No. 8.46, which was
rejected by the state appellate court.  Thompson, 2010 WL 3789138,
at *27.  However, the Court need not address this claim because
Petitioner did not include it in the instant federal petition.
Dkt. 1. at 11-12.

United States District Court
For the Northern District of California

Trombetta, 467 U.S. 479, 485 (1984)).  Therefore, a criminal

defendant is entitled to adequate instructions on the defense

theory of the case.  Conde v. Henry, 198 F.3d 734, 739 (9th Cir.

2000).  However, due process does not require that an instruction

be given unless the evidence supports it.  Hopper v. Evans, 456

U.S. 605, 611 (1982); Menendez v. Terhune, 422 F.3d 1012, 1029

(9th Cir. 2005).  The defendant is not entitled to have jury

instructions raised in his or her precise terms where the given

instructions adequately embody the defense theory.  United States

v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996).

   "Even if there is some 'ambiguity, inconsistency or

deficiency' in [a jury] instruction, such an error does not

necessarily constitute a due process violation."  Waddington v.

Sarausad, 555 U.S. 179, 190 (2009) (quoting Middleton v. McNeil,

541 U.S. 433, 437 (1977)).  "Rather, the defendant must show both

that the instruction was ambiguous and that there was "'a

reasonable likelihood'" that the jury applied the instruction in a

way that relieved the State of its burden of proving every element

of the crime beyond a reasonable doubt."  Id. at 190-91 (quoting

Estelle v. McGuire, 502 U.S. 62, 72 (1991) (internal quotation

marks and citation omitted); see also Donnelly v. DeChristoforo,

416 U.S. 637, 643 (1974) ("'[I]t must be established not merely

that the instruction is undesirable, erroneous or even

"universally condemned," but that it violated some [constitutional

right].'").

   The omission of an instruction is less likely to be

prejudicial than a misstatement of the law.  Walker v. Endell, 850

F.2d 470, 475-76 (9th Cir. 1987) (citing Henderson v. Kibbe, 431

U.S. 145, 154 (1977)).  Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'"  Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson, 431 U.S. at 155).

If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, see Brecht, 507 U.S. at 637, before granting relief in habeas proceedings.  Calderon, 525 U.S. at 146-47.  Under AEDPA, a federal habeas court need not determine whether the state court's harmlessness determination on direct review, which is governed by the "harmless beyond a reasonable doubt" test set forth in Chapman v. California, 386 U.S. 18, 24 (1967), was contrary to or an unreasonable application of clearly established federal law.  Fry v. Pliler, 551 U.S. 112, 119-20 (2007); Brecht, 507 U.S. at 637 (on collateral review, the Chapman "harmless beyond a reasonable doubt" standard of prejudice must give way to the less onerous standard of whether the error had a substantial and injurious effect or influence in determining the jury's verdict).  However, no case forbids use of the Chapman test, and a number of Ninth Circuit cases have used it.  See, e.g., Ponce v. Felker, 606 F.3d 596, 606 (9th Cir. 2010) (finding no prejudice under Chapman and Brecht); Medina v. Hornung, 386 F.3d 872, 878 (9th Cir. 2004) (in applying the "unreasonable application" clause of § 2254(d)(1), habeas court may determine whether state court's harmless error analysis under Chapman was objectively unreasonable).

United States District Court
For the Northern District of California

2.    Instructions on Self-Defense and Unreasonable Self-Defense

Petitioner attacks two instructions given to the jury on self-defense, and claims that they were erroneously given. Specifically, Petitioner argues that CALJIC No. 5.17 (unreasonable self-defense) and CALJIC No. 5.55 (plea of self-defense may not be contrived) did not include an escalation exception allowing for self-defense if a victim responds to a simple assault with deadly force.  Ex. A at 75.

a.    Background Facts

The state appellate court described the factual background on this claim as follows:

> Without objection or request for modification, the court advised the jury on defendants' right to self-defense using language in CALJIC Nos. 5.50 (self-defense -- assailed person need not retreat), 5.54 (self-defense by an aggressor), and 5.55 (plea of self-defense may not be contrived).  The jury was told, in pertinent part: "A person threatened with an attack that justifies the exercise of the right of self-defense need not retreat.  In the exercise of his right of self-defense a person may stand his ground and defend himself by the use of all force and means which would appear to be necessary to a reasonable person in a similar situation and with similar knowledge; and a person may pursue his assailant until he has secured himself from danger if that course likewise appears reasonably necessary.  This law applies even though the assailed person might more easily have gained safety by flight or by withdrawing from the scene" (CALJIC No. 5.50); "[i]f the victim of simple assault responds in a sudden and deadly counterassault, the original aggressor need not attempt to withdraw and may use reasonably necessary force in self-defense" (CALJIC No. 5.54); and "[t]he right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense" (CALJIC No. 5.55).  On the issue of unreasonable self-defense, the court advised the jury using language in CALJIC No. 5.17 (actual but unreasonable belief in necessity to defend -- manslaughter), as follows: "A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of murder.  This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief.  Such an actual but

unreasonable belief is not a defense to the crime of voluntary manslaughter.  [¶]  As used in this instruction, an 'imminent' peril or danger means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer.  [¶]  However, this principle is not available, and malice aforethought is not negated, if the defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force or attack.  [¶]  This principle applies equally to a person who kills in purported self-defense or purported defense of another person."

Thompson, 2010 WL 3789138, at *19.

    b.    State Court Opinion

The state appellate court rejected this claim, stating:

The court's instructions using language in CALJIC Nos. 5.17 and 5.55 are correct statements of the law.  CALJIC No. 5.17 derives from In re Christian S. (1994) 7 Cal. 4th 768, 773, fn. 1 (see also People v. Hardin (2000) 85 Cal. App. 4th 625, 630 & fn. 2, 634), and CALJIC No. 5.55 derives from People v. Hinshaw (1924) 194 Cal. 1, 26.)

We reject defendants' contention that the challenged instructions were legally incorrect because they failed to include "the exception for cases in which a victim (here, [Hodge] with the .357) escalates an assault by responding in deadly fashion."  The jury in this case was advised that "[i]f the victim of simple assault responds in a sudden and deadly counterassault, the original aggressor need not attempt to withdraw and may use reasonably necessary force in self-defense."  (CALJIC No. 5.54.)  "'[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial.' [Citation.]  'The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.' [Citation.]"  (People v. Burgener (1986) 41 Cal. 3d 505, 538-539, disapproved on another ground in People v. Reyes (1998) 19 Cal. 4th 743, 756.)

To the extent defendants contend the instructions failed to clarify the type of "quarrel" (CALJIC No. 5.55) or "wrongful conduct" (CALJIC No. 5.17) that would forfeit a defendant's right of self-defense, the issue is forfeited "because defendant[s] did not request such clarification" at the trial.  (People v. Jenkins (2000) 22 Cal. 4th 900, 1020 (Jenkins); see People v. Miceli (1951) 101 Cal. App. 2d 643, 648-649 [defendant asserting self-defense claim must request amplification where defense is based on "sudden and perilous" counter assault].)

Defendants' additional contention that there was no evidence supporting an instruction that their right of self-defense

81

may not be contrived (CALJIC No. 5.55) is without merit.  The
evidence demonstrated defendants were not seeking just "an
argument or fist-fight" with the victims.  Even if defendants
saw Cobbs give a gun to Hodge, such conduct did not entitle
defendants to arm themselves and provoke a deadly
confrontation as the victims attempted to leave the area to
avoid trouble.  On these facts, the court reasonably
determined an instruction using language in CALJIC No. 5.55
was appropriate.  "A trial judge's superior ability to
evaluate the evidence renders it highly inappropriate for an
appellate court to lightly question his determination to
submit an issue to the jury.  A reviewing court certainly
cannot do so where, as here, the trial court's determination
was agreeable to both the defense and the prosecution."
(People v. McKelvy (1987) 194 Cal. App. 3d 694, 705.)

Even if the instruction using language in CALJIC No. 5.55
should not have been given, we find no prejudice.  The
challenged language was just a portion of eighteen
instructions on self-defense and unreasonable self-defense,
"some of which were mutually exclusive.  It was obvious to
anyone that not all of those instructions could apply to the
case . . . ."  (People v. Olguin (1994) 31 Cal. App. 4th
1355, 1381.)  The jurors were specifically instructed, "Some
of these instructions may not apply, depending on your
findings about the facts of the case . . . .  After you have
decided what the facts are, follow the instructions that do
apply to the facts as you find them."  We presume the jurors
followed the court's instructions to disregard those
instructions that did not apply to the facts found by the
jurors.

Id. at *20.

    c. Analysis

  This federal claim of instructional error is procedurally

barred.  As mentioned above, the procedural default doctrine

forecloses federal review of a state prisoner's federal habeas

claims if those claims were defaulted in state court pursuant to

an independent and adequate state procedural rule.  Coleman, 501

U.S. at 729-30.  The Ninth Circuit has recognized and applied the

California contemporaneous objection rule in affirming denial of a

federal petition for procedural default where there was a complete

failure to object at trial.  See e.g., Paulino v. Castro, 371 F.3d

1083, 1092-93 (9th Cir. 2004) (barring review of jury instruction

error claim because no contemporaneous objection).  Petitioner's failure to object to the use of CALJIC Nos. 3.17 and 3.55 at trial bars his claim that their use violated his right to due process. However, even if the Court overlooked the procedural default, the claim fails on the merits as discussed next.

As part of its evaluation of Petitioner's instructional error claim, the California Court of Appeal implicitly determined that the self-defense instructions -- CALJIC Nos. 5.17 and 5.55 -- were correct as a matter of state law.  See id.  A state court's interpretation of state law binds a federal court sitting in habeas corpus.  See Bradshaw, 546 U.S. at 76); Hicks, 485 U.S. at 629.  Therefore, the state appellate court's ruling -- that the challenged self-defense instructions were correct as a matter of state law -- is binding on this Court.  See id.  A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  See Estelle, 502 U.S. at 71-72.  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  Id. at 72 (quoting Cupp v. Naughton, 414 U.S. 141, 147 (1973)).  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id.  Petitioner also must show actual prejudice from the error, i.e., that the error had a substantial and injurious effect or influence in determining the jury's verdict, before the court may grant federal habeas relief.  Calderon, 525 U.S. at 146 (citing Brecht, 507 U.S. at 637).

United States District Court
For the Northern District of California

1

### 1)   CALJIC No. 5.17

2      Petitioner specifically contends that CALJIC No. 5.17:

3  (1) failed to include an "escalation exception"; and (2) the

4  language excluding self-defense for "wrongful conduct" creating

5  "circumstances" justifying a response is "overbroad, ambiguous,

6  and misleading."  Ex. A. at 78.  He claims that the instructional

7  error denied him the fair trial guaranteed by the Due Process

8  Clause.

9      First, Petitioner's challenge to CALJIC No. 5.17 has no

10 reasonable basis because the quoted language from this particular

11 instruction does not embody an "escalation exception."  When

12 combined with other instructions given, this instruction informed

13 the jury that if Petitioner created the need for the victims to

14 respond with non-deadly force, and the victims responded with

15 deadly force, the victims' response was not "legally justified,"

16 and did not rule out Petitioner's use of deadly force in

17 appropriate self-defense.  If this were not clear from the wording

18 of CALJIC No. 5.17, it was made express in the immediately

19 following instructions which defined the force the victims were

20 legally justified in using.  See 5CT 1116.  CALJIC Nos. 5.31 and

21 5.32 made express that the victims could use only such force as

22 was necessary to repel Petitioner's attack, and that deadly force

23 could not be used to respond to non-deadly force.  See id.; 12RT

24 2574-2575.  Accordingly, the instructions, when logically read

25 together, expressed to the jury that if Hodge responded to

26 Petitioner's non-deadly physical and verbal threats to Wallace by

27 pulling out a gun and shooting at Petitioner, then Petitioner was

28 justified in responding with deadly force.

**United States District Court**
For the Northern District of California

84

Next, Petitioner's second contention -- that the terms "wrongful conduct" and "circumstances" as used in the third paragraph of the instruction were overbroad, ambiguous, and misleading -- was found by the state appellate court to be "forfeited 'because defendant[s] did not request such clarification' at the trial." Thompson, 2010 WL 3789138, at *20.

In sum, the Court finds Petitioner's arguments challenging CALJIC No. 5.17 unavailing because the precise defense urged here was that Hodge shot first and that Petitioner and Coleman were justified in self-defense. Thus, any arguments about perceptions or application of non-deadly force are irrelevant to this case. CALJIC No. 5.17 had no real application in the consideration of those arguments. Finally, any error would have been harmless under Brecht. The state appellate court pointed out that the jury was also instructed with CALJIC No. 5.54, as explained above. This instruction advised the jury, "If the victim of simple assault responds in a sudden and deadly counterassault, the original aggressor need not attempt to withdraw and may use reasonably necessary force in self-defense." Id. at *20 (quoting CALJIC No. 5.54). Therefore, this Court finds reasonable the state appellate court's conclusion that the fact that "the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial." Id. Petitioner has not shown that an instructional error was committed, let alone that any such error so infected the entire trial that the resulting conviction violated due process. See Estelle, 502 U.S. at 72. Accordingly, Petitioner is not entitled to relief on his instructional error

United States District Court
For the Northern District of California

1  claim relating to CALJIC No. 5.17.

2                  2)   CALJIC No. 5.55

3       As mentioned above, the jury was instructed with CALJIC No.

4  5.55, which stated, "The right of self-defense is not available to

5  a person who seeks a quarrel with the intent to create a real or

6  apparent necessity of exercising self-defense."  5CT 1117.

7  Petitioner claims that CALJIC No. 5.55 "was erroneously given

8  because there was no evidence of an intentional ruse."  Ex. A at

9  76.  In essence, Petitioner argues that "courts should not

10  instruct contrived self-defense as a limitation on self-defense

11  unless the evidence supports it."  Id. at 76-77.  Petitioner also

12  argues this instruction failed to include the "escalation

13  exception," mentioned above under his challenge to CALJIC No.

14  5.17.  Id. at 77.  And finally, Petitioner argues that CALJIC No.

15  5.55 is overbroad.  Id. at 78.

16       Petitioner's final argument was deemed "forfeited" by the

17  state appellate court.  Thompson, 2010 WL 3789138, at *20.

18  Therefore, the Court will only address his first two arguments.

19       The state appellate court held that the evidence, outlined

20  above, supported the giving of CALJIC No. 5.55, and that even if

21  an error had occurred it was harmless.  Id.  This Court finds

22  reasonable the appellate court's harmless error analysis.  As

23  mentioned above, Petitioner is not entitled to relief unless the

24  instructional error "had substantial and injurious effect or

25  influence in determining the jury's verdict."  See Brecht, 507

26  U.S. at 637.  The proper question in assessing harm in a habeas

27  case is, "'Do I, the judge, think that the error substantially

28  influenced the jury's decision?'"  O'Neal v. McAninch, 513 U.S.

United States District Court
For the Northern District of California

432, 436 (1995).  If the court is convinced that the error did not
influence the jury, or had but very slight effect, the verdict and
the judgment should stand.  Id. at 437.  If, on the other hand,
the court is not fairly assured that there was no effect on the
verdict, the conviction cannot stand.  Id. at 437-48.

First, no possible error or prejudice is shown.  Neither the
prosecutor nor either defense counsel argued that Petitioner was
precluded from shooting at Hodge, if Hodge began shooting at
Petitioner first, merely because Petitioner had incited a
fistfight with Wallace.  Rather, the defense theory was pure self-
defense, asserting that, without provocation, Hodge pulled his gun
and began firing first, and that Petitioner responded.  The
prosecutor argued that the evidence showed that Petitioner and
Coleman produced and began firing their guns before Hodge acted.
See 12RT 2545, 2549.  Therefore, there is no reasonable likelihood
that the jury believed that Hodge produced and fired his gun
first, but that self-defense was ruled out on the part of the
Petitioner and Coleman because they incited a fistfight in the
first place.

Next, reading the instruction literally, as suggested by
Petitioner, eliminates the possibility the jury relied on the
instruction.  The only person who was arguably shown by the
evidence to have sought a quarrel was Petitioner.  Thus, the
instruction would not have applied to Coleman.  Petitioner points
to nothing in the instructions precluding Coleman from meeting
deadly force with deadly force.  Nevertheless, the jury found
Coleman guilty of murder of Hodge as well as Wallace.  This shows
that the jury simply did not believe the self-defense theory that

United States District Court
For the Northern District of California

Hodge shot first.  It was not the instruction that eliminated self-defense by Petitioner; rather, the jury found the evidence did so.  Therefore, the instruction was irrelevant and harmless. Similarly, while Petitioner may arguably have sought a quarrel with Wallace, there is no evidence he sought one with Hodge, who was some distance away from him.  Once again, the instruction would not have applied to Petitioner's shooting at Hodge even had the jury found Hodge pulled his gun first and began shooting.  The guilty verdict on the charge that Petitioner shot Hodge showed the jury did not rely on CALJIC No. 5.55.  The jury demonstrably rejected the defense theory that Hodge shot first.  No prejudice could have flowed from the instruction.

In sum, one argument on this issue was waived, and there was no reasonable likelihood that the jury interpreted CALJIC No. 5.55 in isolation, yielding the misinterpretation suggested by Petitioner.  At any rate, the evidence shows that the jury disregarded the self-defense theory independent of issues relating to CALJIC No. 5.55.  Therefore, this Court finds reasonable the appellate court's conclusion neither error nor prejudice was shown.  <u>Thompson</u>, 2010 WL 3789138, at *20.  Accordingly, Petitioner is not entitled to relief on his instructional error claim relating to CALJIC No. 5.55.

            3.   Accomplice Liability Instructions
     Petitioner argues his constitutional rights were violated when "[t]he court gave largely bare-bones CALJIC instructions for aiding and abetting and conspiracy liability, both tied to the natural and probable consequences doctrine . . . ."  Ex. A at 81.

**United States District Court**
For the Northern District of California

Petitioner's arguments turn on the contention that he was not involved in killing of Hodge, only the killing of Wallace.

### a.   Background Facts

The state appellate court described the factual background on this claim as follows:

> Without objection or request for modification, the court instructed the jury on accomplice liability and the natural and probable consequences doctrine using language in CALJIC Nos. 3.00 (principals -- defined, § 31), 3.01 (aiding and abetting -- defined), 3.02 (principals -- liability for natural and probable consequences).  The instructions given in this case have been held to be correct statements of law generally.  (People v. Richardson (2008) 43 Cal. 4th 959, 1022 [discussing language in CALJIC No. 3.02]; Coffman and Marlow, supra, 34 Cal. 4th at pp. 106-107 [discussing language in CALJIC Nos. 3.01 and 3.02]; People v. Samaniego (2009) 172 Cal. App. 4th 1148, 1165 (Samaniego) [discussing language in CALCRIM 400 that corresponds to language in CALJIC No. 3.00]; People v. Brigham (1989) 216 Cal. App. 3d 1039, 1046-1047, 1055-1056 [court properly rejected engrafting concepts of conspiracy liability on aiding and abetting instructions]; but cf. People v. Nero (2010) 181 Cal. App. 4th 504, 518 (Nero) [even in unexceptional circumstances language in CALJIC No. 3.00 can be misleading].)

Thompson, 2010 WL 3789138, at *21.

### b.   State Court Opinion

The state appellate court rejected his claim, stating:

> We conclude defendants' challenges to the instructions are not properly before us as there was no objection or request for modification by defense counsel at trial.  (Jenkins, supra, 22 Cal. 4th at p. 1020; Samaniego, supra, 172 Cal. App. 4th at p. 1163.)  In any event, as we now discuss, the given instructions do not require reversal.
>
> Using language in CALJIC No. 3.00, the court specifically advised the jury that, "Persons who are involved in committing a crime are referred to as principals in that crime.  Each principal, regardless of the extent or manner of participation, is equally guilty.  Principals include: [¶] 1. Those who directly and actively commit the act constituting the crime, or [¶] 2. Those who aid and abet the commission of the crime" (CALJIC No. 3.00).  Defendants argue the court's use of the "equally guilty" language was erroneous because it implies "a nonkiller is automatically guilty of first-degree murder as long as the killer

premeditates." We disagree. The "equally guilty" language in CALJIC No. 3.00 addresses the basic, introductory concept of principal liability in that both an actual perpetrator of a crime and a person who aids and abets the perpetrator's commission of a crime are deemed to be principals. (§ 31.) The sentence using the "equally guilty" language does not tell the jury that, in effect, the actual perpetrator and the aider and abettor are or must be found guilty of the same offense, and given the other instructions, no juror would reasonably so interpret the language as defendants suggest.[FN15]

[FN 15:] Since the trial in this case, CALJIC No. 3.00 has been modified by incorporating language reflected in People v. McCoy (2001) 25 Cal. 4th 1111 (McCoy), and Samaniego, supra, 172 Cal. App. 4th 1148. (See Use Note to CALJIC No. 3.00 (Spring 2010 Revision) (Spring 2010 ed.) p. 113.) CALJIC now directs a court to instruct a jury, in relevant part: "When the crime charged is . . . [murder] . . . , the aider and abettor's guilt is determined by the combined acts of all the participants as well as that person['s] own mental state. If the aider and abettor's mental state is more culpable than that of the actual perpetrator, that person's guilt may be greater than that of the actual perpetrator. Similarly, the aider and abettor's guilt may be less than the perpetrator's, if the aider and abettor has a less culpable mental state." (CALJIC No. 3.00 (Principals—Defined (Spring 2010 Revision) (Spring 2010 ed.) p. 112.)

Using language in CALJIC Nos. 3.01 and 3.02, the court also specifically advised the jury that, "A person aids and abets the commission of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purposes of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting. [¶] One who aids and abets another in the commission of a crime or crimes is not only guilty of that crime or those crimes, but also is guilty of any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted. [¶] In order to find the defendant guilty of the crimes as charges in Counts 1 [first degree murder of Wallace] & 2 [first degree murder of Hodge], you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime or crimes of Murder was or were committed; [¶] 2. That the defendant aided and abetted that or those crimes; [¶] 3. That a co-principal in that crime committed the crimes of Murder; and [¶] 4. The crimes of Murder was or were a natural and probable consequence of the commission of the crimes of Murder. [¶] In determining whether a consequence is 'natural and probable,' you must apply an objective test,

United States District Court
For the Northern District of California

based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur.  The issue is to be decided in light of all of the circumstances surrounding the incident.  A 'natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened.  'Probable' means likely to happen.  [¶]  You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crime of Murder was a natural and probable consequence of the commission of that target crime."

Defendants argue the use of language in CALJIC Nos. 3.01 and 3.02 was prejudicial because everything in the instructions "implies a nonkiller is automatically liable for first-degree murder as long as the actual killer" acts with premeditation; and the instructions failed "to explain the actual killer's premeditation (not just any second-degree murder) must be foreseeable to a nonkiller."  However, "if the instructions were susceptible of the interpretation defendant[s] now assert[], counsel likely would have objected at trial on this basis."  (Young, supra, 34 Cal. 4th at p. 1203.)  Additionally, the given instructions using the language in CALJIC Nos. 3.01 and 3.02 could not reasonably be interpreted as defendants suggest.  CALJIC No. 3.01 focused the jury's attention on and held defendants accountable for their own mental states with regard to the victims' murders.  (McCoy, supra, 25 Cal. 4th at pp. 1120, 1122.)  The jury instructions given on first degree murder (CALJIC Nos. 8.00, 8.10, 8.11, 8.20), second degree murder (CALJIC No. 8.30), and voluntary manslaughter (CALJIC No. 8.40), made it clear that defendants could not be found guilty of those offenses without possessing the required mental state.  The jury was to consider separately whether either defendant was guilty of first degree murder, second degree murder, or voluntary manslaughter (CALJIC Nos. 8.50, 8.70, 8.71, 8.72, 8.74, 8.75), and specify the crimes committed by each defendant, if any, in the verdict sheet (CALJIC No. 8.70, 17.00, 17.02).  Any doubt as [to] a defendant's liability for murder in the first degree, murder in second degree, or manslaughter, had to be resolved in that defendant's favor (CALJIC Nos. 8.71, 8.72), and there had to be unanimous agreement as to whether a defendant was guilty of first degree murder, second degree murder or manslaughter (CALJIC No. 8.74).  As part of its duty "to determine whether the defendant is guilty or not guilty of murder in the first degree or of any lesser crime thereto," the jury was told it had the "discretion to choose the order in which [it] evaluate[d] each crime and consider[ed] the evidence pertaining to it."  There is no reasonable likelihood the jury misunderstood the instructions, when considered as a whole.

. . . .

. . . .  As recognized by our Supreme Court, and applicable to the circumstances of this case, "the dividing line between the actual perpetrator and the aider and abettor is often blurred.  It is often an oversimplification to describe one person as the actual perpetrator and the other as the aider and abettor.  When two or more persons commit a crime together, both may act in part as the actual perpetrator and in part as the aider and abettor of the other, who also acts in part as an actual perpetrator . . . .  The aider and abettor doctrine merely makes aiders and abettors liable for their accomplices' actions as well as their own.  It obviates the necessity to decide who was the aider and abettor and who the direct perpetrator or to what extent each played which role."  (McCoy, supra, 25 Cal. 4th at p. 1120.)

Even if we assume the trial court's instructions did not adequately instruct the jury on the matter of accomplice liability, reversal is not required.  The evidence established each "defendant 'weigh[ed] and consider[ed] the question of killing' before deciding" to actually commit or aid and abet the other in committing first-degree murders of Wallace and Hodge.  (People v. Prieto (2003) 30 Cal. 4th 226, 253 (Prieto).)  Before the incident, both defendants discussed their animus against Hodge and Wallace.  When Hodge was seen on the street, the car was stopped and defendants quickly secured loaded weapons.  Both defendants then followed both victims as the victims attempted to leave The Village.  When the opportunity arose (Wallace said, "Let's fight"), Thompson responded by firing his gun at Wallace, and then firing his gun at Hodge.  At about the same time, Coleman fired his rifle at Hodge.  In light of this evidence, there is no reasonable doubt the jury found that each defendant personally acted with willfulness, deliberation, and premeditation, once it rejected defendants' principal claim that Hodge was the first person who fired a gun causing defendants to respond in justifiable self-defense.  "Accordingly, any omission in the instructions, even if erroneous, was harmless under both Chapman v. California (1967) 386 U.S. 18, 24, and [People v.] Watson [(1956)] 46 Cal .2d [818, 836 (Watson)]."

Id. at *21-23 (footnote in original).

c.   Analysis

This claim is procedurally defaulted; the state appellate court found the issue waived due to the lack of objection or request for modification at trial.  See Paulino, 371 F.3d at 1092-93.  In addition, the Court of Appeal reasonably applied controlling law.  The state appellate court's rulings based on state law are binding here.  See Bradshaw, 546 U.S. at 76.  In any

event, the state appellate court found that the given instructions on accomplice liability did not require reversal, as explained below.

Petitioner contends that his due process rights were violated by the trial court's failure to instruct the jury that an aider and abetter can be convicted of a lesser offense than the perpetrator. The state appeal court rejected the claim upon finding that the instructions given had been held to be "correct statements of law generally." Thompson, 2010 WL 3789138, at *21 (citing People v. Richardson, 43 Cal. 4th 959 (2008)). The California Supreme Court has approved of CALJIC No. 3.02 as an adequate explication of the natural and probable consequences doctrine. Richardson, 43 Cal. 4th at 1022.

Petitioner's argument for an instruction on a lesser included offense is based on People v. Woods, 8 Cal. App. 4th 1570 (1992), which, as the state appellate court explained, holds:

> when the evidence raises a question whether the greater offense is a reasonably foreseeable consequence of the act aided and abetted but establishes that a lesser offense is such a consequence, the jury would be provided with an unwarranted all-or-nothing choice with respect to the aider and abettor. . . . [A] jury may be reluctant to acquit of the greater crimes if left without the alternative of a guilty verdict for petty theft. [citations omitted]. Either result (acquittal of the aider and abettor although the evidence establishes guilt of a lesser offense, or conviction for the greater offense because the jury has no option of finding the defendant liable for the lesser crime) is unjust and unacceptable.

8 Cal. App. 4th at 1589.

The state appellate court rejected Petitioner's argument after finding the jury instructions given apprised the jury that he could be found guilty of a lesser offense. The instructions to which the state appellate court referred were CALJIC Nos. 3.01 and

**United States District Court**
For the Northern District of California

3.02, which have been quoted in full above.  The state appellate court examined other instructions given at trial and concluded, "There is no reasonable likelihood the jury misunderstood the instructions, when considered as a whole."  Thompson, 2010 WL 3789138, at *22.

The jurors were elsewhere instructed, pursuant to CALJIC No. 8.70, that it was their duty to determine the degree of murder, and specify the crimes committed by each defendant, if any, in the verdict sheet (CALJIC No. 8.70, 17.00, 17.02).  Id.  They were provided with instructions on first degree murder (CALJIC Nos. 8.00, 8.10, 8.11, 8.20), second degree murder (CALJIC No. 8.30), and voluntary manslaughter (CALJIC No. 8.40), and these instructions "made it clear that defendants could not be found guilty of those offenses without possessing the required mental state."  Id.  Any doubt as to a defendant's liability for murder in the first degree, murder in second degree, or manslaughter, had to be resolved in that defendant's favor (CALJIC Nos. 8.71, 8.72), and there had to be unanimous agreement as to whether a defendant was guilty of first degree murder, second degree murder or manslaughter (CALJIC No. 8.74).  Id.  The state appellate court thus concluded that, when viewed as a whole, the instructions provided sufficient guidance to jurors.  Id.

The state appellate court further distinguished Woods, stating:  "Unlike the situation in Woods, the jurors in this case were not 'given an unwarranted, all-or-nothing choice' of either convicting both defendants of the same crime or of acquitting the aider and abetter of any liability for the killing."  Id. at *23 (citing Woods, 8 Cal. App. 4th at 1588, 1590).

For the reasons set out by the state appellate court, there was no reasonable likelihood that the jury misunderstood the accomplice liability instructions in light of the other instructions given at trial.  In any event, the state appellate court convincingly showed that no error could have had a substantial or injurious effect.

Accordingly, Petitioner is not entitled to relief on his claim of instructional error relating to the accomplice liability instructions.

### 4.   Conspiracy Liability

Petitioner claims that the trial court's "late decision to instruct on conspiracy to commit murder (beyond aiding and abetting) as a theory of liability -- over defense objections there was no evidence of any such conspiracy -- was error."  Ex. A at 92.  Thus, Petitioner argues that the "erroneous instruction on an unsupported theory of guilt denied [him] due process by reducing the prosecution's burden to prove the supported theories of guilt, and by denying him his right to a jury determination[] on all elements essential for murder liability."  Id. at 93.

### a.   Background Facts

The state appellate court described the factual background on this claim as follows:

> Although defendants were not charged with the crime of conspiracy, the prosecutor requested instructions on conspiracy as one of the theories of liability for first degree murder of both victims on the ground the evidence supported an inference that an agreement existed between defendants to confront and kill the victims.  Alternatively, the prosecutor argued that even if the jury concluded there was only a conspiracy to kill Hodge, and Wallace was not the subject of the original conspiracy, his murder was something that occurred during the furtherance of the conspiracy and as a natural and probable consequence of the conspiracy to kill

United States District Court
For the Northern District of California

Hodge.  Over objections by both defense counsel, the court
granted the prosecutor's request that the jury be instructed
on conspiracy using language in CALJIC Nos. 6.10.5
(conspiracy and overt act -- defined -- not pleaded as a
crime charged), 6.11 (conspiracy -- joint responsibility),
and 6.12 (conspiracy -- proof of express agreement not
necessary).  The court found a theory of liability based on
conspiracy was supported by the facts heard by the jury.
When the court indicated it would instruct the jury on
conspiracy over defense objections, Thompson made no
objection to the instructions requested by the prosecutor.
The court granted Coleman's request to give additional
instructions using language in CALJIC Nos. 6.13 (association
alone does not prove membership in conspiracy), 6.16 (when
conspirators not liable for act or declaration of co-
conspirator), 6.18 (commission of act in furtherance of a
conspiracy does not itself prove membership in conspiracy),
6.20 (withdrawal from conspiracy), and 6.21 (liability for
acts committed after termination of conspiracy).

Thompson, 2010 WL 3789138, at *24.

     b.    State Court Opinion

The state appellate court rejected Petitioner's claim upon

finding that his challenges to the conspiracy instructions did not

require reversal, stating:

"It is long and firmly established that an uncharged
conspiracy may properly be used to prove criminal liability
for acts of a coconspirator.  [Citations.]  'Failure to
charge conspiracy as a separate offense does not preclude the
People from proving that those substantive offenses which are
charged were committed in furtherance of a criminal
conspiracy [citation]; nor, it follows, does it preclude the
giving of jury instructions based on a conspiracy theory
[citations].'  [Citation.]"  (People v. Belmontes (1988) 45
Cal. 3d 744, 788-789, disapproved on another ground in
Doolin, supra, 45 Cal. 4th at p. 421 & fn. 22.)

Defendants argue there was no evidence of any conspiracy,
noting that "Cobbs did not report one single word suggestive
of an agreement to murder anyone," and inferring a coherent
conspiracy to murder the victims based on "general trash
talking, prearming in a dangerous area, and confronting
erstwhile friends during a chance late night encounter is
sheer speculation."  We conclude defendants' argument is
without merit.

"'The existence of a conspiracy may be inferred from the
conduct, relationship, interests, and activities of the
alleged conspirators before and during the alleged
conspiracy.  [Citations.]'  [Citation.]"  (People v.
Rodrigues (1994) 8 Cal. 4th 1060, 1135.)  Thus, to establish

the existence of a conspiracy, "it is not necessary to prove that the parties met and actually agreed to perform the unlawful act or that they had previously arranged a detailed plan for its execution." (People v. Lipinski (1976) 65 Cal. App. 3d 566, 575.)  Nor is it necessary for the People to establish defendants as conspirators "personally participated in each of several overt acts [because] members of a conspiracy are bound by all acts of all members committed in furtherance of the conspiracy." (People v. Cooks (1983) 141 Cal. App. 3d 224, 312.)  Contrary to defendants' contention, the evidence was far from speculative.  Rather, it permitted the jury to reasonably infer both defendants had some animus against both victims.  As soon as defendants spotted the victims, they stopped the car and immediately armed themselves with loaded guns that had been stashed in the neighborhood.  Defendants then proceeded to follow the victims as the victims attempted to leave the area to avoid any confrontation with defendants.  When the opportunity arose, Thompson and Coleman fired their guns at the victims. Defendants' immediate flight after the shootings was evidence of their consciousness of guilt.  Having reviewed the record, we are satisfied the trial court properly instructed on the principles of conspiracy over defense counsels' objections.

The conspiracy instructions were correct statements of the law. (Prieto, supra, 30 Cal. 4th at pp. 249-250.)  Our Supreme Court has specifically rejected defendants' contention that the language in CALJIC Nos. 6.11 and 6.16 misstates conspiracy liability.  (Prieto, supra, at pp. 249-250.)  Because we are bound by the Supreme Court's ruling (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal. 2d 450, 455), we do not further address the issue.

Id. at *24-25.

   c. Analysis

The state appellate court addressed this claim by concluding that the California Supreme Court has rejected the contention that the language in CALJIC Nos. 6.11 and 6.16 misstates conspiracy liability.  Thompson, 2010 WL 3789138, at *25.  CALJIC 6.11 (conspiracy -- joint responsibility) states that the jury "could not find defendant guilty under conspiracy theory if [the] charged crime was not [the] natural and probable consequence of conspiracy."  Meanwhile, CALJIC No. 6.16 states: "Where a conspirator commits an act which is neither in furtherance of the object of the conspiracy nor the natural and probable consequence

of an attempt to attain that object, he alone is responsible for and is bound by that act, and no responsibility therefore attaches to any of his confederates."

Given the correct statement of the law in CALJIC Nos. 6.11 and 6.16, there was not a reasonable likelihood that these instructions relieved the prosecution of its burden to prove the elements of the offense beyond a reasonable doubt.  See Waddington, 555 U.S. at 190-91 (standard).

Furthermore, the state appellate court reasonably applied controlling law.  The court's rulings based on state law are binding here.  See Bradshaw, 546 U.S. at 76.  In any event, the state appellate court found that the given instructions on conspiracy liability did not require reversal.  Moreover, the court properly rejected Petitioner's equal protection claims.  The claims are without basis in the record, and Petitioner fails to acknowledge that conspirators are not similarly situated to aiders and abettors.  See People v. Morante, 20 Cal. 4th 403, 417 (1999), fn. 5 (citing Callanan v. United States, 364 U.S. 587, 594 (1961). Therefore, Petitioner's claim relating to the instructions on conspiracy liability are without merit, and he is not entitled to relief on this claim.

    5.   Voluntary Intoxication

Petitioner argues the trial court's instruction on voluntary intoxication, CALJIC No. 4.21.1, was erroneous because it did not "appraise the jurors they 'must,' not 'should' or 'may,' consider all the evidence regarding intoxication."  Ex. A at 95.  He adds that the "incorrect language lightens the prosecution's burden of proving every element of the offense beyond a reasonable doubt,

thereby depriving [P]etitioner of due process and a fair trial."
Id. at 96.   Petitioner further argues the "instructions on
intoxication also failed to include the late-added conspiracy
theory."   Id.

### a.   Background Facts

The state appellate court described the factual background
on this claim as follows:

> Without objection or request for modification by defense
> counsel, the court instructed the jury on the issue of
> voluntary intoxication using language in CALJIC No. 4.21.1.
> The jury was specifically told: "It is the general rule that
> no act committed by a person while in a state of voluntary
> intoxication is less criminal by reason of that condition.
> [¶]   Thus, in the crimes of possession of firearm by a felon
> charged in Counts 3 & 4, the fact that the defendant was
> voluntarily intoxicated is not a defense and does not relieve
> defendant of responsibility for the crime.   This rule applies
> in this case only to the crimes of possession of firearm by a
> felon.   [¶]   However, there is an exception to this general
> rule, namely, where a specific intent is an essential element
> of a crime.   In that event, you should consider the
> defendant's voluntary intoxication in deciding whether the
> defendant possessed the required specific intent at the time
> of the commission of the alleged crime.   [¶]   Thus, in the
> crimes of First Degree Murder, charged in Counts 1 & 2, or
> the lesser crimes of Second Degree Murder and Voluntary
> Manslaughter, or the allegations of intentional discharge of
> a firearm which proximately caused great bodily injury and
> death, intentional discharge of a firearm, or personal use of
> a firearm, a necessary element is the existence in the mind
> of the defendant of certain specific intents which is
> included in the definition of the crimes set forth elsewhere
> in these instructions.   [¶]   If the evidence shows that a
> defendant was intoxicated at the time of the alleged crime,
> you should consider that fact in deciding whether or not that
> defendant had the required specific intent.   [¶]   If from all
> the evidence you have a reasonable doubt whether a defendant
> had the required specific intent, you must find that
> defendant did not have that specific intent.   [¶]   In
> deciding whether a defendant is guilty as an aider and
> abettor, you may consider evidence of voluntary intoxication
> in determining whether a defendant tried as an aider and
> abettor had the required mental state.   However, intoxication
> evidence is irrelevant on the question whether a charged
> crime was a natural and probable consequence of the
> originally contemplated crime."

Thompson, 2010 WL 3789138, at *25.

United States District Court
For the Northern District of California

b.    State Court Opinion

The California Court of Appeal denied this claim, stating:

Defendants contend the quoted instructions were legally incorrect because the intoxication instructions needed to apprise jurors they "must," not "should" or "may," consider all the evidence regarding intoxication.  We disagree.  The challenged language must be considered in the context of the intoxication instruction as a whole, as well as the other instructions.  (People v. Jablonski (2006) 37 Cal. 4th 774, 831.)  The jury was first advised of the statement of the general rule that voluntary intoxication does not make an act less criminal, and the rule only applied to the crimes of possession of a firearm by a felon as charged in counts three and four of the information.  (People v. Aguirre (1995) 31 Cal. App. 4th 391, 401.)  The jury was then told "there is an exception to this general rule, namely, where a specific intent is an essential element of a crime.  In that event, you should consider the defendant's voluntary intoxication in deciding whether the defendant possessed the required specific intent at the time of the commission of the alleged crime."  The instruction advises the jury of the specific offenses and allegations to which the exception to the general rule applied, and, "If the evidence shows that a defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether or not that defendant had the required specific intent.  [¶]  If from all the evidence you have a reasonable doubt whether a defendant had the required specific intent, you must find that defendant did not have that specific intent."  Thus, when read as a whole, the instructions did not "'withh[o]ld from the jury the mandatory duty to consider all of the evidence as it related to [defendants'] mental capacity.'"  (People v. Yoder (1979) 100 Cal. App. 3d 333, 338.)  There is no reasonable likelihood the jurors would view the use of the words "should" or "may" as authorizing them to arbitrarily ignore evidence of defendants' voluntary intoxication on the issue of specific intent crimes as suggested by defendants.

Defendants also argue the intoxication instruction was legally incorrect because it failed to expressly mention the conspiracy theory.  According to defendants, "[t]he pointed exclusion of conspiracy (unlike aiding and abetting) seriously skewed these instructions; any juror would take these more specific instructions to mean intoxication was only relevant on aiding and abetting, not conspiracy."  We disagree.  "'Intoxication is . . . relevant only to the extent that it bears on the question of whether the defendant actually had the requisite specific mental state.'  [Citation.]  An instruction relating intoxication to any mental state is therefore '. . . more like the "pinpoint" instructions' that 'are not required to be given sua sponte.'  [Citation.] . . .  [Thus], the court did not have a sua sponte duty to give any instruction on the relevance of intoxication, any more than it had to instruct on the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

relevance of other evidence.  In the absence of instructions, defense counsel could simply argue that defendant did not actually have the necessary mental state due to his intoxication, just as counsel could argue any other inferences from the evidence." (People v. Castillo (1997) 16 Cal. 4th 1009, 1014.)  In this case, the jurors were not given a pinpoint instruction advising them to consider evidence of intoxication in determining whether a defendant had the requisite mental state of a conspirator.  However, the jury was directed to consider each defendant's voluntary intoxication in determining whether a defendant had the requisite mental states for the crimes of "First Degree Murder, charged in Counts 1 & 2, or the lesser crimes of Second Degree Murder and Voluntary Manslaughter." Additionally, the jurors were specifically instructed that liability as a conspirator required that each defendant act "with the specific intent to agree to commit the crime of [m]urder, and with the further specific intent to commit that crime."  Thus, the failure to mention conspiracy in the voluntary intoxication instructions did not preclude the jury's use of any evidence of intoxication in evaluating whether defendants conspired with each other.  (People v. Letner and Tobin (2010) 50 Cal. 4th 99, 187 (Letner and Tobin).)

We also reject defendants' contention that the omission of the conspiracy theory from the intoxication instruction was "quite unfair since conspiracy turned out to be a major theory and intoxication went a long way to rebutting any coherent conspiracy to commit murder here."  Although Cobbs testified both defendants appeared to be intoxicated before the murders, there was no evidence of the amount of alcohol, if any, either defendant had consumed before the murders. Nor was there any evidence from which the jury could reasonably infer defendants' alleged intoxication "so reduced or impaired" their mental capacity "as to negate the required criminal intent" to convict them of murder in the first degree on a conspiracy theory.  (People v. Marshall (1996) 13 Cal. 4th 799, 848.)  The prosecutor did not argue the jury could not consider voluntary intoxication in determining whether a defendant was a conspirator.  Neither defendant actually argued the jury should acquit based on their voluntary intoxication.  "For these reasons, any error in the instructions did not preclude the jury's consideration of defense evidence, nor is it reasonably probable that different instructions would have resulted in a verdict more favorable to defendants." (Letner and Tobin, supra, 50 Cal. 4th at p. 187.)

Id. at *25-26.

c.   Analysis

The California Court of Appeal's decision was not

unreasonable.  The California Supreme Court has upheld this

instruction and found that a jury may, but is not required to, consider evidence of voluntary intoxication.  People v. Mendoza, 18 Cal. 4th 1114, 1133-34 (1998).  Thus, to the extent the state appellate court was interpreting California law, its rulings are not reviewable here.  See Bradshaw, 546 U.S. at 76.  In addition, Petitioner's claim is procedurally defaulted by lack of objection or request for modification at trial.  See Paulino, 371 F.3d at 1092-93.  Nor has Petitioner shown that the inclusion of this instruction violated due process.  Accordingly, Petitioner is not entitled to relief on this claim.

        6.  Impeached Witnesses

    Petitioner contends the trial court reduced the prosecution's burden of proof by instructing the jury with CALJIC No. 2.21.2, which relates to impeached witnesses and provides: "A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others.  You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars."  Ex. A at 100 (citing 5CT 1110 (emphasis added)).  Petitioner argues that this instruction somehow would allow the jury to consider testimony made by "key impeached prosecution witness Mr. Cobb[s]" and resolve dispositive credibility questions based on a "preponderance standard" rather than by proof beyond a reasonable doubt.  Id. at 100-01.

    The state appellate court reasonably rejected the claim, pointing to settled California law and stating:

        . . . our Supreme Court has repeatedly rejected this specific

United States District Court
For the Northern District of California

argument and approved the use of the quoted language in
CALJIC No. 2.21.2, finding no constitutional error. (See
People v. Whisenhunt (2008) 44 Cal. 4th 174, 220-221; People
v. Nakahara (2003) 30 Cal. 4th 705, 714; People v. Maury
(2003) 30 Cal. 4th 342, 428-429.)  Because we are bound by
the Supreme Court's rulings (Auto Equity Sales, Inc. v.
Superior Court, supra, 57 Cal. 2d at p. 455), we do not
further address the issue.

Thompson, 2010 WL 3789138, at *27.

The Ninth Circuit has rejected a similar challenge to CALJIC
No. 2.21.2.   See Turner v. Calderon, 281 F.3d 851, 865-66 (9th
Cir. 2002).   The Ninth Circuit found the instruction
constitutional "because the jury 'remained free to exercise its
collective judgment to reject what it did not find trustworthy or
plausible.'"   Id. at 866 (quoting Cupp v. Naughten, 414 U.S. 141,
149 (1973)).   This Court is bound by the Ninth Circuit's holding
in Turner.

Accordingly, Petitioner is not entitled to habeas relief on
this claim.

F.   Cumulative Error

Petitioner contends that the cumulative effect of the errors
described above deprived him of his right to a fair trial.

In some cases, although no single trial error is sufficiently
prejudicial to warrant reversal, the cumulative effect of several
errors may still prejudice a defendant so much that his conviction
must be overturned.   See Alcala v. Woodford, 334 F.3d 862, 893-95
(9th Cir. 2003) (reversing conviction where multiple
constitutional errors hindered defendant's efforts to challenge
every important element of proof offered by prosecution).
Cumulative error is more likely to be found prejudicial when the
government's case is weak.   See id.

The state appellate court denied Petitioner's claim of

cumulative error, stating: "Even if some improprieties occurred, any errors were harmless, considered individually or collectively, and did not deny defendants a fair trial or reliable verdicts." Thompson, 2010 WL 3789138, at *28.

Under the circumstances, it simply cannot be said that the state appellate court's rejection of Petitioner's cumulative error claim was contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d). Moreover, there was overwhelming evidence implicating Petitioner in the murder and refuting his claim of self-defense. Accordingly, Petitioner is not entitled to federal habeas relief on his claim of cumulative error.

G.    Sentencing Claims[12]

1.    Consecutive Term for Possession of Firearm By Felon

Petitioner contends that the trial court's imposition of a consecutive term of twenty-five years to life for his conviction of being a felon in possession of a firearm violates California Penal Code section 654 because his possession of the firearm was incidental to his use of the firearm during the murders.  Ex. A at 104.  He argues that the trial court should have stayed the sentence pursuant to section 654.  Id.  Under section 654, a

_____

[12] In the instant petition, Petitioner raises as his arguments labeled "XII" and "XIII," sentencing claims challenging the prior prison term sentence enhancement and parole revocation restitution fine, respectively.  Dkt. 1 at 12.  The state appellate court resolved these in his favor and modified the judgment accordingly, on the People's concessions.  Thompson, 2010 WL 3789138, at *30. Accordingly, these claims for relief are DENIED as moot.

single course of conduct cannot be divided up and punished separately if each offense is "incidental to one objective." People v. Liu, 46 Cal. App. 4th 1119, 1134 (1996); see also Cal. Penal Code § 654.   The crime of being a felon in possession of a firearm in California "is complete once the intent to possess is perfected by possession.   What the ex-felon does with the weapon later is another separate and distinct transaction undertaken with an additional intent which necessarily is something more than the mere intent to possess the proscribed weapon."   People v. Ratcliff, 223 Cal. App. 3d 1401, 1414 (1990).

The Court of Appeal rejected this claim as follows:

Section 654 bars multiple punishment for offenses committed in one course of conduct when those offenses arise from a single intent and objective on the defendant's part.   (Neal v. State of California (1960) 55 Cal. 2d 11, 18–21; People v. Jones (2002) 103 Cal. App. 4th 1139, 1143 (Jones).)   However, "[w]here a defendant entertains multiple criminal objectives independent of and not merely incidental to each other, he may be punished for more than one crime even though the violations share common acts or are parts of an otherwise indivisible course of conduct.  [Citation.]"  (People v. Blake (1998) 68 Cal. App. 4th 509, 512 (Blake).)   The applicability of section 654 is a question of fact for the trial court, which is vested with broad latitude in making its determination.   (People v. Hutchins (2001) 90 Cal. App. 4th 1308, 1312.)   By imposing consecutive terms, the court impliedly found Thompson "harbored a separate intent and objective for each offense."  (Blake, supra, 68 Cal. App. 4th at p. 512.)   The court's finding will not be reversed on appeal if there is any substantial evidence to support it.   (Ibid.)

"'Whether a violation of section 12021, forbidding persons convicted of felonies from possessing firearms . . . constitutes a divisible transaction from the offense in which [a defendant] employs the weapon depends upon the facts and evidence of each individual case.'"  (People v. Bradford (1976) 17 Cal. 3d 8, 22, quoting People v. Venegas (1970) 10 Cal. App. 3d 814, 821.)   "[M]ultiple punishment is improper where the evidence 'demonstrates at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense . . . .'  [Citation.]"  (Jones, supra, 103 Cal. App. 4th at p. 1144; see People v. Ratcliff (1990) 223 Cal. App. 3d 1401, 1412

(<u>Ratcliff</u>).)  Alternatively, "section 654 is inapplicable when the evidence shows that the defendant arrived at the scene of his or her primary crime already in possession of the firearm." (<u>Jones</u>, <u>supra</u>, 103 Cal. App. 4th at p. 1145.)

Thompson argues "there is no fair basis here for an implied finding [he] possessed the gun separate from [the murder] offenses." We disagree. "A violation of section 12021, subdivision (a) is a relatively simple crime to commit: an ex-felon who owns, possesses, or has custody or control of a firearm commits a felony. Implicitly, the crime is committed the instant the felon in any way has a firearm within his control." (<u>Ratcliff</u>, <u>supra</u>, 223 Cal. App. 3d at p. 1410, fn. omitted.) "Commission of a crime under section 12021 is complete once the intent to possess is perfected by possession. What the ex-felon does with the weapon later is another separate and distinct transaction undertaken with an additional intent which necessarily is something more than the mere intent to possess the proscribed weapon. [Citations.]" (<u>Ratcliff</u>, <u>supra</u>, 223 Cal. App. 3d at p. 1414.)

In this case there was no evidence "'fortuitous circumstances put the firearm in [Thompson's] hand only at the instant of committing another offense . . . .'" (<u>Jones</u>, <u>supra</u>, 103 Cal. App. 4th at p. 1144.) Based upon the circumstances leading to the gunfight and Thompson's conduct of pulling a firearm from his pocket, the trial court could reasonably find that Thompson committed the crime of possessing a firearm by a felon by possessing it before the shooting. (<u>Id.</u> at p. 1147.) Thompson then committed the separate crimes of first degree murder, either as a principal, aider and abettor, or conspirator, when he shot his gun first at Wallace and then at Hodge. Because substantial evidence supports the court's implicit finding that section 654 did not apply, the imposition of a consecutive term of 25 years to life for the conviction for possession of a firearm by a felon must be upheld.

<u>Thompson</u>, 2010 WL 3789138, at *28-29.

First, Petitioner's allegation that the imposition of consecutive sentencing violated California Penal Code section 654 is not cognizable in a federal habeas proceeding. See <u>Swarthout v. Cooke</u>, 131 S. Ct. 859, 861-62 (2011) (reaffirming that federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law); <u>Wilson v. Corcoran</u>, 131 S. Ct. 13, 16 (2010) ("it is only noncompliance with federal law that renders a State's criminal

United States District Court
For the Northern District of California

106

**United States District Court**
For the Northern District of California

judgment susceptible to collateral attack in the federal courts.").

Second, even if it was a cognizable claim, the state appellate court's rejection of such a claim was objectively reasonable.  The state appellate court determined that the trial court could reasonably find that Petitioner completed the act of being a felon in possession of a firearm prior to the shooting of either Hodge or Wallace.  <u>Thompson</u>, 2010 WL 3789138, at *29. Title 28 U.S.C. § 2254(e)(1) requires this Court to presume correct any determination of a factual issue made by a state court.  Thus, the two convictions were not part of a single course of criminal conduct, and the state appellate court reasonably found that section 654 did not apply.  <u>Id.</u>  Accordingly, Petitioner is not entitled to relief on this claim.

> 2.  Consecutive Terms of Imprisonment and Restitution Order

Petitioner asserts his consecutive unstayed terms of imprisonment and substantial victim restitution order are barred by <u>Cunningham v. California</u>, 549 U.S. 270 (2007), as well as its predecessors, <u>Apprendi v. New Jersey</u>, 530 U.S. 446 (2000), and <u>Blakely v. Washington</u>, 524 U.S. 296 (2004).  Ex. A at 107.

The state appellate court found no reason to address this claim because it is "contrary to both federal and state cases which [the court is] bound to follow (<u>Auto Equity Sales, Inc. v. Superior Court</u>, <u>supra</u>, 57 Cal. 2d at p. 455) or otherwise find persuasive."  <u>Thompson</u>, 2010 WL 3789138, at *29 (citations omitted).

The state appellate court's decision is objectively

reasonable.  Petitioner's argument that the consecutive sentencing and restitution order violated Apprendi, Blakely, and Cunningham is foreclosed because clearly established law provides that consecutive sentences are decisions not typically reserved for the jury, and thus, do not implicate the Sixth Amendment.  See Oregon v. Ice, 555 U.S. 160, 168-69 (2009) (declining to extend Apprendi to a state's sentencing system that gives judges discretion to determine facts allowing imposition of consecutive or concurrent sentences for multiple offenses, noting that determination of consecutive versus concurrent sentences is traditionally not within the function of the jury).  Accordingly, Petitioner is not entitled to habeas relief on this claim.

H.   Incorporation of Coleman's Arguments

As his final claim, Petitioner purports to "join and incorporate by reference all arguments raised or to be raised, by [Coleman] in this case and any related writs and appeals, to the extent those arguments inure to his benefit."  Ex. A at 108 (citing Cal. R. of Ct. 8.200(a)(5)).

By joining in and adopting "all" arguments that might be beneficial to him, Petitioner fails to articulate a claim, and underlying supporting facts, specific to himself.  Further, Petitioner tasks the Court with picking and choosing from another party's state court brief which claims might be beneficial to him in his federal habeas petition.  Such a claim does not meet the minimal pleading requirements for pro se prisoners seeking federal habeas relief.

Pleadings from a pro se prisoner are meant to be liberally construed.  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699

(9th Cir. 1988).  Despite this liberal construction, <u>pro se</u> petitioners "must follow the same rules of procedure that govern other [civil] litigants."  <u>King v. Atiyeh</u>, 814 F.2d 565, 567 (9th Cir. 1987).  Further, this more relaxed pleading standard does not require federal courts to construct legal arguments for <u>pro se</u> petitioners.  <u>See, e.g.</u>, <u>Small v. Endicott</u>, 998 F.2d 411, 417–18 (7th Cir. 1993).  At a most basic level, federal habeas petitioners must allege facts in their petitions that sufficiently point to a "real possibility of constitutional error."  <u>Blackledge v. Allison</u>, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Note to Rule 4, Rules Governing Habeas Corpus Cases, 28 U.S.C. § 2254 (1976)).

Here, based on the face of the petition, there is no possibility of constitutional error as to this claim.  In the instant petition, no discernable allegations are stated and no federal law is cited in conjunction with this claim.  Rather, Petitioner states: "XV. Joinder in Arguments of Coappellant." Dkt. 1 at 13.  As mentioned above, in his brief on direct appeal, Petitioner made a general reference to arguments previously asserted or "to be raised" by Coleman, and provides a citation to a provision of the California Rules of Court allowing this type of incorporation by reference by petitioners seeking habeas relief in California courts.  Ex. A at 108.  Again, Petitioner does not elaborate as to which of Coleman's claims he wishes to incorporate.  In his traverse, Petitioner still makes no reference to which of Coleman's arguments he intends to join.

Accordingly, Petitioner's final claim fails to state facts sufficient to allege a federal constitutional violation. Therefore, Petitioner is not entitled to relief on this claim.

CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED as to all claims.

No certificate of appealability is warranted in this case. See Rule 11(a) of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (requiring district court to rule on certificate of appealability in same order that denies petition). Petitioner has failed to make a substantial showing that any of his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial of his claims debatable or wrong. See Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

Dated: January 8, 2016

CLAUDIA WILKEN
United States District Judge

110